No. 99-288

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 286

302 Mont. 189

14 P.3d 444

STATE OF MONTANA,

Plaintiff and Respondent,

v.

CHADLEY RAY THERRIAULT,

Defendant and Appellant.

APPEAL FROM: District Court of the Fourth Judicial District,

In and for the County of Missoula,

The Honorable Ed P. McLean, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Kenneth H. Gray, Jackson & Rice, Helena, Montana

For Respondent:

Joseph P. Mazurek, Montana Attorney General, Mark W. Mattioli, Assistant Montana Attorney General;
Fred R. Van Valkenburg, Missoula County Attorney, Missoula, Montana

Submitted on Briefs: December 16, 1999
Decided: November 15, 2000

Filed:

_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 The Defendant, Charley Ray Therriault (Therriault), appeals the orders and judgments entered by the Fourth Judicial District Court, Missoula County, that granted the State's petition to revoke his probationary sentence and denied his motion to suppress evidence. We affirm.

¶2 Therriault raises two issues:

1. Did an Intensive Supervision Program officer's entry into Therriault's unoccupied residence, without consent from Therriault, constitute an unlawful search requiring suppression of evidence?

2. Did the State provide Therriault with reasonable notice of what constituted a violation of his probation?

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 In October of 1996, Therriault entered into a plea agreement in which he agreed to plead guilty to seven felony counts. Therriault, who was 18 years old at the time of the crimes, stood charged with four counts of felony theft, one count of felony criminal endangerment involving a high-speed chase with a police officer, and two felony counts of sexual intercourse without consent involving a 14-year-old female. All seven occurred within little more than six months time.

¶4 In December of 1995, Therriault stole a pickup from a car lot, which was recovered in January of 1996 when the missing vehicle was discovered at a motel where Therriault had registered under his own name. Six months later, Therriault stole a motorcycle and drove it the next day to his 14-year-old girlfriend's home. The motorcycle was discovered stashed near the residence after police arrived in response to the girl's mother's 9-1-1 call. The girl's mother had apparently warned Therriault not to continue relations with her

daughter. Therriault and the young teen had been "dating" for about one-and-a-half years. Therriault was caught sneaking out of the girl's bedroom window by her brother, who detained him until police arrived. Just days later, having been released on his own recognizance, Therriault was again discovered with the girl, this time by his sister. He fled with the girl by stealing his parents' car. He would eventually leave the car at a used car lot in Missoula where he and the girl took another vehicle for an unauthorized test drive. The lot's owner summoned the assistance of law enforcement. The criminal endangerment charge arose during the subsequent failed apprehension of Therriault, as an officer chased him out of town, onto a mountain road, and eventually gave up his pursuit.

¶5 In exchange for his pleas, the State agreed to recommend concurrent prison terms of 10 years for each count, with a portion suspended. The plea agreement also required the State to recommend that Therriault be placed in the Intensive Supervision Program (ISP). In March of 1997, Therriault was accepted by ISP after an initial rejection by the program in February.

¶6 On April 16, 1997, following a sentencing hearing, the District Court sentenced Therriault to the Department of Corrections for ten years, with seven years suspended upon several conditions. The court recommended that Therriault be placed in the Intensive Supervision Program, and would be subject to "all the rules and regulations" of the State Department of Corrections.

¶7 The conditions of his suspended sentence provided that Therriault could not knowingly engage in any conduct whatsoever "offensive to the laws of the State of Montana, any other states, or any of the laws of the United States of America." Further, he was required to "conduct himself as a good citizen at all times." Therriault was also required to "submit himself, his vehicle and his residence to search at any time by lawful authorities upon reasonable request of his Probation Officer."

¶8 According to his ISP supervising officer, Therriault's record of compliance as an ISP "inmate" during 1997 was less than stellar. Nevertheless, he made progress to the point that as the end of 1997 drew near, completion of his ISP program was in sight, which apparently meant he would become an ordinary probationer, subject to less intensive supervision. An event in December of that year would change all of that.

¶9 At or before 6 p.m., on December 18, 1997, Therriault's ISP supervising officer, Mike McCarty, arrived at Therriault's residence near Arlee, Montana, for the purpose of

conducting a routine check. Testimony indicated that it may have been as early as 5 p.m., while McCarty stated it was closer to 6 p.m. Therriault was required to comply with a 6 p.m. curfew. According to McCarty's testimony, he regularly stopped by Therriault's residence unannounced at various times, conducted random tests for drugs and alcohol, searched the premises for contraband or unauthorized possession of certain items, such as firearms and ammunition, and routinely phoned Therriault to monitor his employment status and involvement with the required community service.

¶10 McCarty knocked several times, and eventually opened the door and called out to Therriault, and identified himself. With no answer, McCarty entered the residence. He spotted what he thought might be a note left for him on the kitchen counter explaining where Therriault had gone. Instead, the piece of paper apparently was a high school registration application for a female student. Other than perhaps the applicant's name, it is not clear from the record to what degree McCarty studied and gained information from the application at that time. Satisfied that Therriault was not at home, McCarty left.

¶11 McCarty then went to Therriault's sister's residence, which was next door. According to the testimony of McCarty as well as Therriault's sister, she informed him that she had seen a girl at Therriault's home during the course of the past two weeks, and questioned McCarty about the lawful age of consent. Learning this, McCarty returned to and entered Therriault's residence again, reviewed the application, and observed that the date of birth of the applicant was in 1983, making the female 14 years old at the time. McCarty testified that he left a note next to the registration application, instructing Therriault to contact him, and proceeded to leave.

¶12 Later that night, at approximately 10 p.m., McCarty returned to the residence with a deputy sheriff. After several minutes of knocking, Therriault answered the door. He admitted that a girl was in the basement. The officers found the girl (hereinafter A.M.) in a basement bedroom. The officers learned she was the same girl identified in the school registration application found earlier by McCarty. A.M.'s attire consisted of a bed sheet. Her clothes were located upstairs.

¶13 A.M. was interviewed by Detective Gregory Hintz a month later on January 14, 1998, at Charlo High School. According to A.M.'s statements provided to Detective Hintz, her relationship with Therriault was one of friendship that had included sexual intercourse on only one occasion. She stated that she "didn't stay there every night, I just stayed there like on and off . . ." She admitted to using his address as her own on her application to Arlee

High School, where she intended to transfer. She explained that on the night of Therriault's arrest, she had been sleeping downstairs alone, and the two did not have any sexual relations at that time. A.M. told Detective Hintz that Therriault knew her age at the time, which was 14 years old. She told the detective that they had met in late November, several weeks prior to his arrest.

¶14 On February 23, 1998, the State petitioned the District Court to revoke Therriault's probation. On June 15, 1998, Therriault filed a motion in limine, seeking to preclude the introduction of A.M.'s statements provided to Officer Hintz in the event A.M. failed to testify at the revocation hearing (at some point, A.M. moved to Nevada to live with an aunt and uncle). On that same day, Therriault also filed a motion to suppress all evidence gained as a result of McCarty's entrance into Therriault's residence, where he observed A.M.'s high school registration application. Therriault alleged that discovery of subsequent evidence--namely Therriault's harboring of A.M.--directly resulted from what amounted to an illegal search and seizure, and should therefore be suppressed as "fruit of the poisonous tree."

¶15 At a June 18, 1998 hearing, the District Court denied Therriault's motion to suppress, and subsequently revoked Therriault's suspended sentence for violating conditions of his probation in a judgment entered July 1, 1998. A.M. was unavailable to testify. The court relied primarily on the hearsay statement she had provided to the detective and the testimony of McCarty.

¶16 Therriault moved for a rehearing, providing the court with A.M.'s sworn affidavit, which substantially recanted the information that she had earlier provided to Detective Hintz. The court granted the motion for rehearing on August 10, 1998.

¶17 A.M. would further testify, during a September 9, 1998 deposition, and refute many of her prior statements. Notably, she emphatically denied that she had had sexual relations with Therriault, and further denied that she had informed her mother of this, which her testimony to Detective Hintz indicated. She testified that she had lied to Detective Hintz. Further, she testified that she was unsure, or could not recall, if she had ever stayed overnight at Therriault's residence since the two first met. When presented with a copy of the interview transcript, she stated that she remembered making the statement that she had stayed overnight at Therriault's house. She stated that they had known each other since September, rather than November, of 1997. She stated she could not remember using his address on her application for Arlee High School.

¶18 In A.M.'s affidavit, prepared by Therriault's counsel following a phone conversation, she also claimed that the testimony provided to Detective Hintz resulted from intimidation. She explained that Detective Hintz had induced her to admit having sex with Therriault by convincing her that Therriault had already admitted this, and that it would be in Therriault's best interest if she admitted it as well.

¶19 Due to A.M.'s recantation, the State subsequently dismissed the information filed against Therriault stemming from his relations with A.M. Therriault moved to dismiss his sentence revocation, arguing that in light of A.M.'s recantation, the State lacked probable cause to pursue the revocation of his suspended sentence. On December 15, 1998, the District Court denied Therriault's petition to dismiss. The court determined that A.M.'s "subsequent recanting of her story does not defeat the fact that at the time the petition was filed, the State demonstrated adequate probable cause to support the revocation petition."

¶20 At the December 30, 1998 revocation hearing, testimony on behalf of Therriault provided a far more innocent explanation for A.M.'s presence at his residence. Testimony indicated that the two were friends, and that A.M. was subjected to an abusive home life. According to Therriault's immediate family's testimony, A.M. turned to Therriault when she felt it was unsafe for her to stay at home, and stayed in the spare bedroom downstairs, where the officers had found her the night in question. The testimony indicated that each of their respective personal belongings were located in separate rooms, consistent with A. M.'s account of her presence at Therriault's residence. It was also asserted that the reason for her living with her aunt and uncle in Nevada was to escape the potentially abusive environment at home.

¶21 The District Court found, in its January 19, 1999 Opinion and Order, that Therriault had violated the terms of his suspended sentence. Specifically, the court found that Therriault had violated Condition #2, which required that Therriault "conduct himself as a good citizen at all times." The "good citizen" standard of conduct was also included in Therriault's ISP agreement. The court rejected Therriault's defense that he had been helping A.M. because she was in danger in her own home. The court stated that "[w]hen one is convicted of a sexual crime, it is not to be expected that conducting himself as a good citizen includes having 14-year old naked girls being in one's basement bedroom."

¶22 The court further found that Therriault was "a parolee released to the Intensive Supervision Program subject to the loss of certain privileges including the right to privacy." The court then issued a judgment on February 19, 1999, sentencing Therriault to

seven years in the Montana State Prison.

¶23 Therriault appeals the denial of his motion to suppress, and the order and judgment of the District Court that revoked his suspended sentence based on his violation of the conditions of his probation.

## STANDARD OF REVIEW

¶24 The standard of review of a district court's denial of a motion to suppress is whether there is substantial credible evidence to support the court's findings of fact, and whether those findings were correctly applied as a matter of law. *State v. Parker*, 1998 MT 6, ¶ 17, 287 Mont. 151, ¶ 17, 953 P.2d 692, ¶ 17 (citing *State v. Roberts* (1997), 284 Mont. 54, 56, 943 P.2d 1249, 1250). We also review whether the court's interpretation and application of the law is correct. *State v. Hubbel* (1997), 286 Mont. 200, 207, 951 P.2d 971, 975 (citation omitted).

¶25 The standard of review for revocation of a suspended sentence is whether the district court abused its discretion. *See State v. Baisch*, 1998 MT 12, ¶ 10, 287 Mont. 191, ¶ 10, 953 P.2d 1070, ¶ 10 (citations omitted). So long as the district court is satisfied that the conduct of the probationer has not been what he agreed it would be when he was given liberty, this Court will not overturn a district court's decision to revoke a suspended sentence. *Baisch*, ¶ 10. However, the State must prove by a preponderance of the evidence that the probationer has violated the terms or conditions of the suspended sentence. *Baisch*, ¶ 10 (citing § 46-18-203, MCA).

## DISCUSSION

### Issue 1.

*Did an Intensive Supervision Program officer's entry into Therriault's unoccupied residence, without consent from Therriault, constitute an unlawful search requiring the suppression of evidence?*

¶26 A criminal defendant who seeks to suppress evidence has the burden of proving that the search was illegal. *State v. McCarthy* (1993), 258 Mont. 51, 55, 852 P.2d 111, 113.

¶27 Although acknowledging his lower expectation of privacy as a probationer, Therriault nevertheless argues that the entry of his ISP officer, McCarty, into his residence without

consent while he was not at home constituted an unlawful search pursuant to the Fourth Amendment of the United States Constitution in conjunction with his greater privacy rights afforded under Article II, Section 10, of the Montana Constitution.

¶28 Consequently, Therriault contends that the information pertaining to A.M. gleaned from McCarty's unlawful entry tainted the subsequent search for, and discovery of, A.M. by McCarty and a sheriff at Therriault's residence later that evening. Thus, the District Court's denial of his motion to suppress should have been granted, which should in turn require reversal of the revocation of his suspended sentence based on a lack of evidence.

¶29 While it is undisputed that Therriault was required to "submit" to a search at any time, day or night, the conditions of his suspended sentence, as set forth by the District Court, clearly provide that his submission was contingent upon not only "reasonable cause" but also the "reasonable request" of his probation officer. The District Court's findings clearly indicate that at no time did Therriault's ISP officer, McCarty, request the alleged "search" of Therriault's residence during which time A.M.'s high school application was discovered. Nevertheless, the State argues that McCarty's conduct in entering Therriault's unlocked door, in light of the 6 p.m. curfew, did not constitute a search of Therriault's residence, and was therefore lawful.

¶30 Thus, the first preliminary matter for our determination is whether a "search" occurred here. We addressed this question, under somewhat similar facts, in *State v. Carlson* (1982), 198 Mont. 113, 644 P.2d 498. In *Carlson*, after entering the defendant's home with an arrest warrant for traffic violations, officers noticed drugs in the front room, in plain view. The facts showed that there was no "prying about in hidden places or looking under sofas by the two officers." *Carlson*, 198 Mont. at 118, 644 P.2d at 501. Further, like McCarty here, the officers seized none of the articles which constituted the evidence sought to be suppressed; rather, the officers observed what appeared to be drugs, left, and later returned with a search warrant.

¶31 We followed a rule, derived from U.S. Supreme Court Fourth Amendment analysis, that if the officers were lawfully in Carlson's front room when they made the visual observations, a search within the constitutional sense did not occur; on the other hand, if their presence in the front room was unlawful, the visual or "plain view" examination constituted a search in the constitutional sense. *Carlson*, 198 Mont. at 119, 644 P.2d at 501.

¶32 Our review of the case at bar can be narrowed to the question "was McCarty lawfully in Therriault's residence when he viewed A.M.'s high school registration application?" We conclude he was not.

¶33 To determine what constitutes an unlawful "intrusion" by the government into one's privacy, under Article II, Section 10, we consider the following factors: (1) whether the person has an actual expectation of privacy; (2) whether society is willing to recognize that expectation as objectively reasonable; and (3) the nature of the state's intrusion. *See State v. Bassett*, 1999 MT 109, ¶ 24, 294 Mont. 327, ¶ 24, 982 P.2d 410, ¶ 24 (citations omitted). *See also State v. Scheetz* (1997), 286 Mont. 41, 48-51, 950 P.2d 722, 726-78 (holding that the use of a drug-detecting canine to inspect checked airline luggage does not offensively intrude upon or invade a person's privacy so as to constitute a search). Article II, Section 10, provides that the right of individual privacy is "essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest."

¶34 In arguing that Therriault, as a participant in the ISP, enjoyed little or no expectation of privacy, the State contends that Therriault was "technically neither a probationer nor a parolee. He was a DOC inmate in ISP." This contention echoes the findings and conclusions of the District Court, which determined the ISP subjected Therriault "to the loss of certain privileges including the right to privacy" and therefore McCarty's conduct did not constitute a search.

¶35 Although not clearly articulated, the State seems to be arguing that an ISP officer perhaps need not even abide by the "reasonable cause" standard for entering a probationer's residence without a warrant when the objective is to ascertain the location of the probationer. This Court adopted the "reasonable cause" warrantless search standard for probation officers from the U.S. Supreme Court's decision, *Griffin v. Wisconsin* (1987), 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709. *See State v. Burke* (1988), 235 Mont. 165, 766 P.2d 254. *See also* Rule 20.7.1101(7), ARM (establishing probation or parole condition that upon reasonable cause, the probation "client" shall submit to a search of his or her residence by a probation officer at any time without a warrant).

¶36 The State apparently suggests that Therriault's ISP officer, McCarty, could access Therriault's house at any time, unannounced, with or without Therriault's presence or permission just as any other authorized DOC personnel may access or visually inspect an inmate's cell. *See, e.g.*, Department of Corrections Policy 3.1.17, 3.1.19, and 3.2.4 (setting

forth DOC policy for its facilities, and establishing procedures for offender searches, investigations, and security inspections).

¶37 McCarty testified to this as well, stating that "[m]y understanding is I don't need any reasonable cause to search an inmate's residence." McCarty further testified that he explained the ISP rules to Therriault like any other ISP "inmate." "I explain the search rules to them, that I have a right to come into their house at any time, that I have [the] right to go into their house and look for contraband at any time." In response to this testimony, the court asked: "With or without their permission?" McCarty responded affirmatively: "With or without their permission."

¶38 The State contends that the District Court did not err, therefore, in denying Therriault's motion to suppress, because the findings of the court clearly reveal that McCarty's "presence in the ISP inmate's home was lawful, entitling him to read, in plain view, what he expected was a note from Therriault." In other words, it was reasonable for Therriault, as an ISP "inmate," rather than an ordinary probationer, to expect that McCarty might gain entry into his unlocked residence at any time in an effort to find him, and that this conduct did not constitute a search.

¶39 Adding credence to the State's position is § 45-7-306, MCA, which defines community corrections programs such as the ISP as "official detention." Pursuant to this classification, an ISP participant may be charged with the offense of felony escape. This statute further provides that "official detention does not include supervision of a person on probation or parole." *See also State v. Chandler* (1996), 277 Mont. 476, 480-81, 922 P.2d 1164, 1167; § 53-30-326, MCA (defining "escape" from community corrections facility or program).

¶40 We conclude, however, that the authority suggesting that an ISP "client" is an "inmate" rather than a "probationer" and is therefore subject to a distinct standard for search and seizure is at best ambiguous, and conflicts with far more persuasive authority that suggests that the ISP is merely a rigid condition imposed on certain probationers, and that it is the sentencing tribunal which establishes the conditions for any search of the "client's" person or property.

¶41 The ISP falls under the authority of the Community Corrections Division of the Department of Corrections. In turn, the ISP is administered by the Probation and Parole Bureau. According to the Community Corrections Division's mission statement, the ISP is

a "specialized form of adult probation and parole supervision lasting nine to 18 months using a heightened level of supervision, monitoring devices and close scheduling. ISP offenders live at home, hold or seek jobs, and are under greater scrutiny than regular probationers and parolees."

¶42 The purpose of the Intensive Supervision Program, as a community correction program, is to "reduce the use of jail space for offenders who need a structured environment, counseling, and supervision but *who may not require incarceration*." *See* § 53-30-302(3), MCA (emphasis added); *State v. Hanners*, (1992), 254 Mont. 524, 525, 839 P.2d 1267, 1268. Further, a community corrections program means "a community-based or community-oriented facility or program, *other than jail*." *See* § 53-30-303(2), MCA (emphasis added).

¶43 Under § 46-23-1001(4), MCA, probation is explicitly defined as "the release by the court *without imprisonment*, except as otherwise provided by law, of a defendant found guilty of a crime upon verdict or plea, subject to conditions imposed by the court and subject to the supervision of the department [of corrections] upon direction of the court." *See also* § 7-32-2120(4), MCA, and § 7-32-2241(4), MCA (defining "inmate" as a person who is confined in a detention center); § 7-32-2120(1), MCA (defining "detention center" as a "facility established and maintained by an appropriate entity for the purpose of confining arrested persons or persons sentenced to the detention center"); § 46-19-301, MCA, and § 46-19-401, MCA (defining "inmate" as a "male or female offender who is under sentence to or confined in a prison or other correctional institution").

¶44 In light of the foregoing, the District Court's April 16, 1997 Judgment clearly provided that Therriault was a probationer, subject to ISP rules. The court stated that "seven (7) years on each of Defendant's sentences are hereby suspended on the terms and conditions listed below . . . [t]he *terms and conditions of probation are as follows*. . ."

¶45 One of the conditions of Therriault's probation required that "during the period of suspension of this sentence the Defendant shall remain under the jurisdiction of this Court and of the Department of Corrections and Human Services, Adult Parole and Probation Bureau of the State of Montana, and the Defendant shall be and is subject to all the rules and regulations of said department."

¶46 Nevertheless, the Department of Corrections, pursuant to § 46-23-1002(3), MCA, may adopt rules for the conduct of persons placed on parole or probation, "except that the

department may not make any rule conflicting with conditions of parole imposed by the board or *conditions of probation imposed by a court*." (Emphasis added). Further, under § 46-23-1011(1), MCA, the "department shall supervise persons during their probation period in accord with the conditions set by a court."

¶47 Accordingly, we conclude that any ISP rule, or any terms or conditions to which an ISP participant is subjected, or any means of supervision by an ISP officer that conflict with a court-ordered condition of a person's probation, would be superseded by that particular court's conditions. We conclude that based on the foregoing, Therriault was on probation, and as a probationer was subject to those rules of the ISP, as well as any other Department of Corrections rules, to the extent that the rules did not conflict with the conditions of his probation as set forth by the District Court.

¶48 The State in this instance, therefore, misconstrues the source of Therriault's "actual expectation" of privacy by characterizing him as an "inmate." Therriault's privacy expectation, however limited, is derived directly from the court's conditions of his probation, which expressly provide that he would submit his residence "to search at any time by lawful authorities *upon reasonable request* of his Probation Officer." This condition is coupled with the DOC's Rule 20.7.1101(7) "reasonable cause" standard, which is necessarily incorporated by reference, pursuant to § 46-18-801, MCA. Thus, Therriault could expect that an intrusion into the privacy of his home would not occur unless McCarty had reasonable cause and first posed a reasonable request.

¶49 That this expectation is one that society is willing to view as objectively reasonable flows from the Legislature's enactment of § 46-23-1011(1), MCA, providing that the DOC will supervise probationers in accordance with the conditions set by the sentencing court, as well as § 46-18-801(1), MCA, which provides that a sentencing judge my deprive an offender of a civil or constitutional right as a "necessary condition of the sentence directed toward the objectives of rehabilitation and the protection of society." In other words, as a society, we have accorded discretion to the judiciary to determine the necessary and proper parameters of a particular probationer's "conditional liberty," within the prescribed boundaries of our federal and state constitutions, which in turn establish the probationer's limited expectation of privacy.

¶50 Accordingly, we conclude that regardless of McCarty's understanding of his authority to conduct searches as in ISP officer, as well as any administrative rules providing such authority, he was limited by the conditions of probation as set forth by the District Court.

*See* Rule 20.7.1101(9) ARM (DOC regulation acknowledging that sentencing court may require other and additional conditions to be placed on probationer). Thus, whether he had a reasonable cause--or whether he believed he needed none--to enter Therriault's residence was not sufficient in this instance.

¶51 Finally, the State contends that the final prong of our analysis, "the nature of the state's intrusion," should lead us to conclude that by its nature, McCarty's warrantless intrusion into Therriault's residence without Therriault's consent, under the specific circumstances set forth here was not unlawful. For example, the State argues that McCarty's entrance was "respectful and courteous" and he did not "rummage" through Therriault's personal effects.

¶52 In *State v. Hubbel* (1997), 286 Mont. 200, 210, 951 P.2d 971, 977, we analyzed this third prong in the context of a police investigation of the scene of a shooting. We observed that the officers "simply parked in the general parking area routinely used by other visitors, and, after observing blood evidence on the driveway and bullet holes in the front door, continued walking along the sidewalk to the front porch." We also observed that the officers did not ignore posted warnings, hop fences, open gates, or slip through bushes intended to screen the home from view. In short, we concluded that the officers "did nothing other than what any other casual visitor to the Hubbel residence would do." *Hubbel*, 286 Mont. at 210, 951 P.2d at 977 (holding that the District Court did not err in denying Hubbel's motion to suppress any evidence observed and seized within plain view in the parking area, on the walkway, and on the front porch of Appellant's home).

¶53 In analyzing the officer's entrance of the home, however, we restated the indelible rule that warrantless searches conducted inside a home are per se unreasonable, "subject only to a few specifically established and well-delineated exceptions." *Hubbel*, 286 Mont. at 212, 951 P.2d at 978. This Court has routinely stated that the physical invasion of the home is the chief evil to which the 4th Amendment and Montana's Article II, § 11, are directed. We have emphasized again and again that the entrance to the home is where the federal and Montana constitutions draw a firm line, and that absent an exception, that threshold may not be crossed without a warrant. *See, e.g., State v. Kao* (1985), 215 Mont. 277, 282-83, 697 P.2d 903, 907 (quoting *Payton v. New York* (1980), 445 U.S. 573, 100 S. Ct. 1371, 63 L.Ed.2d 639); *State v. Bassett*, 1999 MT 109, ¶ 25, 294 Mont. 327, ¶ 25, 982 P.2d 410, ¶ 25. Further, it is well-settled that the government's intrusion into a home through an unlocked door is no different than if entry is gained with a key, or the use of force. *See, e.g., Sabbath v. United States* (1968), 391 U.S. 585, 590, 88 S.Ct. 1755, 1758-

59, 20 L.Ed.2d 828 (interpreting statute that requires an officer to announce his authority before officer may "break" into a home to execute a search warrant). Thus, our analysis of the "nature" of an officer's warrantless intrusion into a person's home cannot escape the necessity that the State prove that one of the exceptions provided under our search and seizure jurisprudence applies.

¶54 Taking the State's position at face value, McCarty entered Therriault's residence twice, once for the limited purpose of locating Therriault, and a second time for the apparent purpose of reviewing A.M.'s high school registration to either gather or confirm information. While both entries may have satisfied the "reasonable grounds" requirement, McCarty's physical presence inside Therriault's residence required that he make a reasonable request prior to entering. Combined, the two conditions formed the only "well-delineated" exception to the warrant requirement at issue here: the one carefully crafted by the District Court as a condition of Therriault's suspended sentence, pursuant to state law.

¶55 Accordingly, we hold that McCarty was unlawfully in Therriault's residence on both occasions when he gathered the information, in plain view, concerning A.M., and therefore his conduct constituted an unlawful search.

¶56 The State argues, however, that even if McCarty's entry into Therriault's residence constituted an unlawful search, and therefore invokes the exclusionary rule, the subsequent "fruit" of the gathered evidence--in this case the discovery of A.M. in Therriault's home later that night--can be "purged" of the taint, and should therefore not be excluded. The State argues that one of the "fruit of the poisonous tree" exceptions to the exclusionary rule should apply, and directs our attention to the "inevitable discovery" rule. Therriault, of course, argues that none of the exceptions apply, and therefore all evidence is irreversibly tainted, and should be suppressed pursuant to the Fourth Amendment "fruit of the poisonous tree" doctrine. Obviously, such an exclusion would extricate all evidence supporting the revocation of Therriault's suspended sentence, and thereby establish an abuse of discretion by the District Court.

¶57 The primary purpose of the exclusionary rule is to "deter future unlawful police conduct" by making evidence which the State obtains through a search and seizure in violation of the Fourth Amendment, inadmissable in criminal proceedings. *State v. Pipkin*, 1998 MT 143, ¶ 12, 289 Mont. 240, ¶ 12, 961 P.2d 733, ¶ 12 (citations omitted). The "fruit of the poisonous tree" doctrine forbids the use of evidence which comes to light as a result of the exploitation of an initial illegal act of the police. *See State v. New* (1996), 276 Mont.

529, 535-36, 917 P.2d 919, 923 (quoting U.S. Supreme Court decision, *Murray v. United States* (1988), 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472, stating that police should be placed in the same, not worse, position once tainted evidence is excised).

¶58 In *New*, we set forth the exceptions to the "fruit of the poisonous tree" doctrine. We stated that the "fruit" or derivative evidence is admissible if it is (1) attenuated from the constitutional violation so as to remove its primary taint; (2) obtained from an independent source; or (3) determined to be evidence which would have been inevitably discovered apart from the constitutional violation. *New*, 276 Mont. at 536, 917 P.2d at 923.

¶59 In that case there was likewise an apparent causal connection between an unlawful search that led to a subsequent lawful search conducted by the defendant's probation officer, which produced incriminating evidence that the defendant wished to exclude. We determined that although testimony indicated that the initial unlawful search was a "factor" in the subsequent search conducted by the officer, he nevertheless possessed sufficient independent information upon which the lawful search was based. *See New*, 276 Mont. at 536-37, 917 P.2d at 923-24.

¶60 The first of the above exceptions is inapplicable due to the proximity in time and place between McCarty's initial intrusion and Therriault's eventual arrest. The latter two exceptions are applicable, however, in determining whether the discovery of A.M. at Therriault's residence on the evening of December 18, 1996, should be excluded as "fruit" of McCarty's prior unlawful entry. Thus, if McCarty possessed either an independent source of information that led him to discover Therriault's probation violation, or was engaged in an investigation that would have ultimately led him to discover the violation, then the "fruit of the poisonous tree" doctrine should not apply. *See New*, 276 Mont. at 537, 917 P.2d at 924. We conclude that the "independent source" exception, which is closely related to the inevitable discovery exception, is more attune with the factual circumstances of the case at bar.

¶61 The testimony in this case indicates that McCarty received independent incriminating information from Therriault's sister. She informed McCarty, with little or no prompting, that she had observed a young female at her brother's residence several times during a two-week period of time, and proceeded to question McCarty about the lawful age of consent out of apparent concern for her brother as a probationer.

¶62 Prior to this discussion, and based on his unlawful observation of the application

located in Therriault's residence, McCarty may have observed the girl's name. It is entirely unclear whether more information than this was obtained at that time. Testimony detailing the subsequent discussion with Therriault's sister does not convincingly demonstrate that he "exploited" whatever scant bits of information pertaining to A.M. he possessed. To the contrary, his questioning of the sister indicated he was far more concerned with physically locating Therriault, in light of the 6 p.m. curfew. The testimony indicates that the critical piece of evidence that he did not possess, which the sister voluntarily provided, was that a girl had been residing at Therriault's residence for approximately two weeks. Then, it was the sister, not McCarty, who raised the subject of the girl's age, as she proceeded to question McCarty about the legal age of consent.

¶63 The District Court summarized the evidence to which counsel for both parties agreed: "he [McCarty] goes inside the kitchen and on the table he observes a school enrollment form. He leaves the premises and goes and talks to the sister. And in talking to the sister, according to Mr. McCarty, he learns that a young lady named [A.M.] is residing at the residence. Lived there for approximately a couple weeks." The only clarification raised by Therriault's counsel was that McCarty may have discovered A.M.'s name during the first entrance into Therriault's residence.

¶64 Thus, it was not the "tainted" evidence of the girl's name, or her age, or the fact that she was transferring to a different school that led to the discovery of A.M. in Therriault's basement that evening; rather, it was the independent information that a girl, of questionable age, had been residing with Therriault for two weeks.

¶65 Further, Therriault's whereabouts were not clearly ascertained by McCarty until he returned that evening at approximately 10 p.m. Establishing that an ISP probationer is at home after curfew through direct, physical observation is clearly a function of McCarty's duties as Therriault's ISP officer. This factor provided McCarty with an additional, independent reason to return to Therriault's residence on the evening that A.M. was discovered.

¶66 We conclude, therefore, that the irrefutable evidence of A.M.'s presence in Therriault's residence on the night of December 18, 1996, was ascertained through sources sufficiently independent of McCarty's unlawful conduct to not warrant exclusion under the "fruit of the poisonous tree" doctrine. Accordingly, we conclude that the District Court did not err when it denied Therriault's motion to suppress, nor did it abuse its discretion when it revoked Therriault's suspended sentence based on the evidence of the officer's subsequent

discovery of A.M. in Therriault's basement.

## Issue 2.

*Did the State provide Therriault with reasonable notice of what constituted a violation of his probation?*

¶67 As a preliminary matter, we conclude that whether Therriault and A.M. had sexual intercourse--which would be a clear-cut violation of his probation on several grounds--is immaterial to our review on appeal. Thus, the lengthy discussion set forth by both parties regarding the veracity of A.M.'s various versions detailing her sexual relations with Therriault will be disregarded.

¶68 Instead we look to the undisputed fact that at no time did A.M. expressly deny residing, from time to time, at Therriault's residence, which included overnight stays. Testimony submitted on Therriault's behalf, in fact, substantiated that A.M. was in fact spending the night at Therriault's residence at the time of his arrest.

¶69 Therriault contends that A.M.'s presence in Therriault's home did not "objectively" violate his probation, and that the "good citizenship" standard is unconstitutionally too vague to sufficiently warn him of what would constitute a violation of his probation conditions, and therefore violated his right to due process. We disagree.

¶70 The District Court revoked Therriault's suspended sentence based on the "good citizenship" standard set forth by the court in his 1997 conditions of probation, both in its July 1, 1998 Judgment, and then in its January 19, 1999 Order and February 19, 1999 Judgment. The condition stated that Therriault must "conduct himself as a good citizen at all times." The court concluded that "[w]hen one is convicted of a sexual crime, it is not to be expected that conducting himself as a good citizen includes having 14-year old naked girls being in one's basement bedroom."

¶71 Thus, our review is narrowly drawn to whether the court abused its discretion when it determined that the undisputed evidence of Therriault's permitting A.M. to remain at his home overnight was not the conduct of a "good citizen," and therefore he violated one of the conditions of his probation.

¶72 Disregarding the more unseemly side of the District Court's findings, and accepting

Therriault's explanation for A.M.'s presence at his residence as true--that he was merely providing shelter for the girl, who apparently had an abusive home environment--we are asked to generously consider the argument that he was, at all times, acting as a "good citizen."

¶73 We conclude that what this argument lacks in merit, it makes up for with sheer banality. Namely, any "good citizen," under any reasonable definition of that term, who was truly concerned about such a girl's welfare would not allow her to routinely stay overnight in such an environment. The consequences of Therriault's choice--i.e., A.M.'s undoubtedly humiliating discovery by officers on the night of his arrest, and the embarrassing questioning at her school and during her deposition--bear this out. In other words, it is simply ludicrous to argue that a genuinely concerned "good citizen" would suggest to a 14-year-old girl from a troubled home that for her own safety she should take up residence at the home of a convicted sex offender, who is on probation and subject to random searches, and that this should be accomplished without the supervising probation officer's knowledge, or without even entertaining the possibility of any other more suitable living arrangements. In this instance, we know "good citizenship" when we see it. Here, we have not.

¶74 Accordingly, we hold that the District Court did not abuse its discretion when it revoked Therriault's suspended sentence based on a violation of the "good citizenship" condition of his probation.

¶75 Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ WILLIAM E. HUNT, SR.

/S/ JIM REGNIER

/S/ KARLA M. GRAY

Justice Terry N. Trieweiler concurring.

¶ 76 I concur with the result of the majority opinion, but not all that is said therein.

/S/ TERRY N. TRIEWEILER