No. 03-243

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 151

STATE OF MONTANA,

       Plaintiff and Respondent,

   v.

CLIFFORD LEE STONE,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Fifth Judicial District,
In and for the County of Jefferson, Cause No. DC 2001-1792
The Honorable Loren Tucker, Judge presiding.

COUNSEL OF RECORD:

       For Appellant:

       Matthew C. Claus, Attorney at Law, Bozeman, Montana

       For Respondent:

       Honorable Mike McGrath, Montana Attorney General, C. Mark Fowler,
Assistant Attorney General, Helena, Montana; Mathew J. Johnson, Jefferson
County Attorney, Boulder, Montana

Submitted on Briefs:  September 25, 2003

Decided:  June 15, 2004

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Clifford Lee Stone (Stone) appeals the judgment of the Fifth Judicial District Court, Jefferson County, denying his motion to suppress and imposing on him an illegal sentence.

¶2 We affirm in part, reverse in part, and remand in part for proceedings consistent with this Opinion.

¶3 1. Did the District Court err in denying Stone's motion to suppress evidence seized during a warrantless search and seizure?

¶4 2. Did the District Court err in imposing on Stone a sentence of five years on his felony animal cruelty charges when Stone was not classified as a felony persistent offender?

## FACTUAL AND PROCEDURAL BACKGROUND

¶5 Stone lived with his wife Mary Parenti in Clancy, Montana, where he ran an animal zoo, called Stone Cave Reptile/Amphibian Ranch Hatchery and Hospital. At this animal zoo, Stone was responsible for several animals, including rabbits, dogs, cats, and guinea pigs.

¶6 Stone kept most of his animals in cages on his property. Because his property was surrounded by a fence, a closed latched gate, and several "No Trespassing" signs, the cages could not be seen from the road.

¶7 To assist him in feeding the animals and in cleaning their cages, Stone hired two neighborhood boys. With their parents' consent, the boys worked on Stone's property after school tending to the animals. The boys ceased working when Stone told them that he could no longer afford to pay them. However, Stone assured them that he would rehire them as soon as he had the money.

2

¶8     Some time later, Stone again asked the boys to assist him with the animals after school. On their first day back in assisting Stone--November 13, 2001--one of the boys went after school onto Stone's property to begin his work. While on the property, the boy discovered a number of dead and dying animals. The animals did not have the appropriate food and water. The rabbits in some of the cages that were still alive were feeding off of the dead rabbits that were contained within the same cages.

¶9     The boy immediately ran home and called his father. His father left work and rushed home. When he got home he asked his son to tell him again what he saw. The boy did so, after which time, the father called the sheriff's office and relayed the story. Deputy Gleich was dispatched and arrived at Stone's residence around six o'clock in the evening. Deputy Gleich approached Stone's residence and found no one home. However, once on Stone's property, Deputy Gleich and two other officers saw some of the rabbit cages and some of the rabbits that were feeding on the dead rabbits in the same cage. They also found dog and cat kennels behind the garage, and none of the dogs or cats in the kennels had food or water.

¶10     After seeing the animals, Deputy Gleich and the other officers became concerned for the animals' well being, as Deputy Gleich testified that it appeared to him "that the animals were starving to death." Deputy Gleich immediately called dispatch and ordered them to contact a veterinarian. He also requested that the boy return, as he knew where all of the cages were located. Deputy Gleich and the other officers began cutting the locks to the

cages, and all people at the scene began feeding and providing water to the rabbits, dogs, and cats found on Stone's property.

¶11    The boy informed the officers that he knew that Stone had animals in the house.  At that point, Deputy Gleich was also informed that Stone was on probation, so Deputy Gleich called Stone's probation officer in order to get his permission to enter the house.  Stone's probation officer arrived, was apprised of the situation, and consented to the entry of Stone's house.  The boy and the veterinarian's assistant crawled through a window that the officers opened, so as to minimize any damage to the house.  The boy and the assistant then opened the door to the house, after which time the remaining individuals entered and assisted the animals contained therein.

¶12    Stone was charged with one misdemeanor count of animal cruelty; one misdemeanor count of child endangerment[1]; and four felony counts of animal cruelty.  He moved to suppress the evidence obtained from the search of his property as an unreasonable search and seizure.  The District Court denied his motion.  Stone was ultimately convicted and sentenced to five years on each felony count of animal cruelty with his sentences to run concurrently.

¶13    Stone now appeals the District Court's denial of his motion to suppress and the sentencing of him to five years on each felony count.

_____

[1]  This charge is not at issue in this appeal.

## STANDARD OF REVIEW

¶14    We review a district court's denial of a motion to suppress to determine whether the district court's findings of fact are clearly erroneous. *State v. Tackitt*, 2003 MT 81, ¶ 11, 315 Mont. 59, ¶ 11, 67 P.3d 295, ¶ 11. We review a district court's conclusions of law to determine whether the district court's interpretation and application of the law is correct. *Tackitt*, ¶ 11.

## DISCUSSION

¶15    **1.    Did the District Court err in denying Stone's motion to suppress evidence seized during a warrantless search and seizure?**

¶16    Stone argues that he had a reasonable expectation of privacy: (1) in the cages around his house, as they were in close proximity to his house; and (2) in the entire fenced area around his house, as he took much effort to protect his privacy by posting several "No Trespassing" signs. In addition, Stone argues that the exigent circumstances exception does not apply to his situation here because: (1) Deputy Gleich did not act as a reasonable person would have acted under the same circumstances because he could have waited to obtain a search warrant; and (2) this case does not involve a threat to the lives of officers or other persons, nor does it involve a situation where relevant evidence may be destroyed or a suspect may escape.

¶17    The State of Montana (the State) argues that Deputy Gleich's entry onto Stone's property and into Stone's house was justified, as exigent circumstances existed. These exigent circumstances, the State argues, included the fact that prompt entry was necessary

5

so as not to frustrate legitimate law enforcement efforts regarding prevention of continuing animal cruelty.

¶18 Under Montana law, a warrantless search is *per se* unreasonable. *State v. Hardaway*, 2001 MT 252, ¶ 36, 307 Mont. 139, ¶ 36, 36 P.3d 900, ¶ 36. However, there exists an exception to the warrant requirement if both exigent circumstances and probable cause justify a warrantless search. *State v. Saxton*, 2003 MT 105, ¶ 26, 315 Mont. 315, ¶ 26, 68 P.3d 721, ¶ 26. Exigent circumstances exist if the situation at hand would cause a reasonable person to believe that prompt action is necessary to prevent physical harm to an officer or other person, the destruction of relevant evidence, the escape of a suspect, or some other consequence improperly frustrating law enforcement efforts. *State v. Wakeford*, 1998 MT 16, ¶ 24, 287 Mont. 220, ¶ 24, 953 P.2d 1065, ¶ 24. Probable cause exists "if the facts and circumstances within the officer's personal knowledge, or imparted to the officer by a reliable source, are sufficient to warrant a reasonable person to believe that the suspect has committed an offense." *Saxton*, ¶ 26.

¶19 Stone concedes that Deputy Gleich had probable cause to enter onto his property. Therefore, with probable cause established, we will only address whether exigent circumstances existed upon which to justify Deputy Gleich's warrantless search of Stone's property.

¶20 Montana has never before addressed whether the exigent circumstances exception applies to situations of threats to animal life. However, several other states have addressed the issue, including the District of Columbia, Wisconsin, Illinois, and Texas.

6

¶21    The defendant in *Tuck v. United States* (1984), 477 A.2d 1115, moved to suppress the evidence seized during a warrantless search of his business. *Tuck*, 477 A.2d at 1117-18. The District of Columbia Court of Appeals applied the exigent circumstances exception in situations of threats to animal life in justifying the warrantless search. *Tuck*, 477 A.2d at 1119.

¶22    In *Tuck*, a humane society cruelty investigator and two officers visited the defendant's pet store in response to a citizen's complaint. While at the pet store, the officers noticed a puppy and a rabbit that appeared to be suffering from the direct sunlight to which they were exposed in the closed unventilated display window of the defendant's store. The temperature outside that day was 103 degrees Fahrenheit. Although reluctant, the defendant removed the puppy from the window, after which time the puppy "perked up and became playful." One of the officers then removed the rabbit from the window chamber which the officer testified to being "as hot as a furnace." The rabbit was immediately rushed to an animal clinic, where a veterinarian diagnosed it as suffering from heat stroke. The defendant was then charged with one count of cruelty to animals. *Tuck*, 477 A.2d at 1117.

¶23    The District of Columbia Court of Appeals ultimately held that exigent circumstances existed to justify the officers' warrantless search. In addressing the defendant's constitutional arguments regarding unreasonable searches and seizures, the District of Columbia Court of Appeals noted that:

> [a]lthough the exigency in the present case involved the protection of animal life rather than human life, we believe that the "public interest" in the preservation of life in general and in the prevention of cruelty to animals in

7

particular "require[s] some flexibility in the application of the general rule that a valid warrant is a prerequisite for a search." *Tuck*, 477 A.2d at 1120 (citations omitted).

¶24 In *State v. Bauer* (1985), 379 N.W.2d 895, in response to a call regarding a dead horse, a state humane officer and an equine specialist arrived on the defendants' property. According to the specialist, the horse had died of starvation. With their suspicions heightened, the humane officer and the specialist observed the barn area that contained other horses, wherein they found the horses standing in solid horse manure without any bedding or food. On this observation, the humane officer seized the horses. The defendants argued that this seizure was in violation of their constitutional right against unreasonable searches and seizures. *Bauer*, 379 N.W.2d at 896-97.

¶25 In addressing the reasonableness of the humane officer's search, the Court of Appeals of Wisconsin noted that a compelling need to assist the horses was present. Specifically, the Court of Appeals of Wisconsin held that:

> Such a compelling need was demonstrated in this case. This need was to stop the ongoing suffering of the animals. The exigent standard test applies to situations involving mistreatment of animals. Cruelty to animals is a statutory offense. It is therefore state policy to render aid to relatively vulnerable and helpless animals when faced with people willing or even anxious to mistreat them. *Bauer*, 379 N.W.2d at 899.

Based on this compelling need, the Court of Appeals of Wisconsin held that the humane officer's search of the defendants' property was justified. *Bauer*, 379 N.W.2d at 899.

¶26 Relying on *Tuck* and *Bauer*, the Illinois Supreme Court in *People v. Thornton* (1997), 676 N.E.2d 1024, also applied the exigent circumstances exception in a situation involving a threat to animal life by targeting the reasonableness of the officers' actions.

8

¶27 In *Thornton*, the police responded to a report that a dog had been barking for several days inside an apartment. The manager had tried unsuccessfully to contact the defendant and to look inside the apartment through the window. After these failed attempts, the manager used her key to enter the defendant's apartment. In a bedroom, the manager found a dog in a cage that "was so small that the dog could not stand inside the cage." In addition, "[t]he bottom of the cage was covered with urine and feces; [t]here was no sign of food or water in the cage; [t]he dog was very thin and had blood on its paws; [and] [t]he dog was shaking and continuously made a whimpering and yelping sound." Based on the manager's report, the police entered the defendant's apartment to check on the dog. The police found the dog in conditions matching those described by the manager. *Thornton*, 676 N.E.2d at 1026-27.

¶28 The Illinois Supreme Court noted that "[t]he guiding principle in fourth amendment search and seizure cases is reasonableness." Hence, the officers "could have reasonably believed that the dog was not merely 'uncomfortable,' but was in need of immediate assistance to avoid serious injury or, possibly, death," based on the information provided to them. *Thornton*, 676 N.E.2d at 1028-29. It was on this "reasonableness" basis that the Illinois Supreme Court in *Thornton* held that the emergency exception applied to the officers' warrantless search of the defendant's house. *Thornton*, 676 N.E.2d at 1029.

¶29 Further, the Court of Appeals of Texas, in *Pine v. State* (1994), 889 S.W.2d 625, *cert. denied*, *Pine v. Texas* (1995), 516 U.S. 914, 116 S.Ct. 300, 133 L.Ed.2d 206, affirmed, based on the exigent circumstances exception, the denial of the defendant's motion to suppress the evidence seized during a warrantless search of his property. *Pine*, 889 S.W.2d at 632.

9

¶30     In *Pine*, an officer entered upon the defendant's property to investigate a complaint of cruelty to animals. The defendant was out of town during this occasion. While on the property, the officer observed several animals, "all of which appeared unhealthy, with bones and ribs showing." This officer then observed a colt that was "wet and muddy and could not stand." The colt had no energy and its ribs were visible. After examining the colt, the officer contacted a veterinarian and the colt was ultimately transported to another ranch where it could be treated. *Pine*, 889 S.W.2d at 628-29. The defendant argued that prior to removing the colt from his property, the officer was required to obtain a search warrant. *Pine*, 889 S.W.2d at 631.

¶31     However, the Court of Appeals of Texas held that ample evidence existed regarding the colt's need for immediate care. As such, the officer was justified in seizing the colt without a warrant, as the officer's belief that an emergency existed was objectively reasonable. *Pine*, 889 S.W.2d at 632.

¶32     As to the case at bar, because of the sanctity of the home under both federal and State search and seizure law, we address the searches of Stone's property and his house separately.

**Stone's Property**

¶33     Here, Deputy Gleich arrived at Stone's house in response to a phone call of animal cruelty. With the knowledge that a neighborhood boy who had previously worked for Stone had seen dead and dying rabbits on Stone's property, Deputy Gleich entered upon Stone's property, at which time he saw the dead and dying rabbits exactly as the boy had described. He and the other officers also saw several dog and cat kennels that did not have any food or

10

water in them.  At that point, much like the officers in *Tuck*, *Bauer*, *Thornton*, and *Pine*, Deputy Gleich became concerned for the welfare of the animals, as he believed that the animals were "starving to death."  And, from this concern, again like the officers in *Tuck*, *Bauer*, *Thornton*, and *Pine*, Deputy Gleich and the other officers began searching for and assisting all of the animals that they found on Stone's property.

¶34    The statute at issue in *Tuck* stated, in pertinent part, that "[w]hoever . . . unnecessarily fails to provide the same [any animal] with proper food, drink, shelter or protection from the weather, shall for every such offense be punished. . . ."  D.C. Code Ann. § 22-801 (1981). Wisconsin's statute, in *Bauer*, addressed the same concerns in stating that "[n]o person owning or responsible for confining or impounding any animal may fail to supply the animal with a sufficient supply of food and water. . . ."  Wis. Stat. § 948.13 (1985) (now Wis. Stat. § 951.13 (2003)).  Illinois' statute, in *Thornton*, stated that "[n]o person or owner may beat, cruelly treat, torment, starve, overwork or otherwise abuse any animal."  510 Ill. Comp. Stat. 70/3.01 (West 1994).  And, Texas' statute, in *Pine*, stated that a person commits the offense of cruelty to animals if the person "intentionally or knowingly . . . fails unreasonably to provide necessary food, care, or shelter for an animal in the person's custody. . . ."  Tex. Penal Code Ann. 42.11(a)(2) (Vernon 1989) (now Tex. Penal Code Ann. 42.09(a)(2) (Vernon 2004)).

¶35    As it read when Stone committed his offense, Montana's statute regarding animal cruelty stated:

(1) A person commits the offense of cruelty to animals if without justification the person knowingly or negligently subjects an animal to mistreatment or neglect by:

    (b)   carrying or confining any animal in a cruel manner;

    (c)   failing to provide an animal in the person's custody with:

    (i)   proper food, drink, or shelter; or

    (ii)   in cases of immediate, obvious, serious illness or injury, licensed veterinary or other appropriate medical care.  § 45-8-211(1)(b), (c)(i)-(ii), MCA (2001).

¶36    As evidenced by the various states' statutory language quoted above, the District of Columbia, Wisconsin, Illinois, Texas, and Montana have all enacted laws evidencing a strong public policy of preventing mistreatment and cruelty to animals.  Or, in the words of the Court of Appeals of Wisconsin, the requirement:  "to render aid to relatively vulnerable and helpless animals when faced with people willing or even anxious to mistreat them." *Bauer*, 379 N.W.2d at 899.  Montana's public policy is the same and is exemplified through the legislative history of § 45-8-211, MCA, and the legislature's adoption of increasingly strong protections for animals against the cruelty and mistreatment of those who would abuse them.

¶37    Specifically, Montana enacted its cruelty to animals statute in 1973.  Since 1973, Montana has revisited its statute, addressing concerns of:  (1) limiting a defendant's custody of animals after the defendant has been twice convicted of cruelty to animals; and (2) the sport of animal fighting.  Indeed, as a direct result of the highly publicized "collie cases" in Toole County in late 2002, the 2003 Legislature amended § 45-8-211, MCA, making the crime of cruelty to animals even more stringent.

¶38    Moreover, as in the case *sub judice*, the courts in *Tuck*, *Bauer*, *Thornton*, and *Pine* all had previously established jurisprudence articulating applicable exigent circumstances

12

exceptions to the warrant requirement. For most of these courts, the issue of whether animal cruelty created a situation of exigent circumstances was an issue of first impression. *See Tuck*, 477 A.2d at 1120; *Thornton*, 676 N.E.2d at 1028; *Pine*, 889 S.W.2d at 631. And, as here, each of the courts in *Tuck*, *Bauer*, *Thornton*, and *Pine* was presented with evidence of an imminent threat to animal life and with evidence that officers were placed in situations where they needed to take immediate action.

¶39 We conclude that Deputy Gleich's warrantless search was justified given the unrefuted imminent threat to the lives and well-being of the animals on Stone's property. We agree that, under the circumstances here, the prevention of needless suffering and death of the animals on Stone's property created exigent circumstances justifying the warrantless search for and rescue of the animals. Consequently, we hold that the District Court did not err in denying Stone's motion to suppress, as Deputy Gleich's warrantless entry onto and search of Stone's property was justified given the unrefuted probable cause and exigent circumstances present.

**Stone's House**

¶40 We have routinely stated that physical invasion of one's house is the "chief evil" to which the Fourth Amendment of the United States Constitution and Article II, Section 11 of the Montana Constitution are directed. *State v. Therriault*, 2000 MT 286, ¶ 53, 302 Mont. 189, ¶ 53, 14 P.3d 444, ¶ 53. We have also emphasized that entrance into one's house is where the federal and Montana constitutions draw a "firm line" regarding entrance without a warrant absent an exception. *Therriault*, ¶ 53 (citations omitted).

13

¶41    However, we have also noted that a "probationer has a reduced privacy interest," as a "probationer is aware that his activities will be scrutinized." *State v. Burke* (1988), 235 Mont. 165, 171, 766 P.2d 254, 257. A probation officer "must be able to supervise the probationer, and upon his judgment and expertise, search the probationer's residence or cause it to be searched." *Burke*, 235 Mont. at 171, 766 P.2d at 257. A probation officer's discretion to search is not without limitations, however. The officer cannot search a probationer's house without first having reasonable cause. *Therriault*, ¶ 48.

¶42    Although the courts in *Tuck*, *Bauer*, *Thornton*, and *Pine* justified the searches at issue in those cases on exigent circumstances, we need not reach that argument here as to Stone's house. Upon learning that Stone was on probation--a fact which Deputy Gleich later remembered that he already knew--Deputy Gleich contacted Stone's probation officer. When Stone's probation officer arrived, he was apprised of the situation. Having reasonable cause to believe that Stone was violating his probation by committing criminal offenses of cruelty to animals inside the house, Stone's probation officer gave Deputy Gleich permission to enter Stone's house. On that basis, the warrantless entry into Stone's house was a justifiable probation search. We hold that the District Court did not err in denying Stone's motion to suppress the evidence seized from the search of his house.

¶43    **2. Did the District Court err in imposing on Stone a sentence of five years on his felony animal cruelty charges when Stone was not classified as a felony persistent offender?**

¶44    Stone argues that because he was not convicted under the persistent felony offender statute, the statutory maximum sentence he should have received was two years on each

14

count of animal cruelty to run concurrently. In addition, Stone argues that although he did not object to his sentence at the District Court level, the sentence he received exceeds the statutory mandates. And, as such, under this Court's holding in *State v. Brister*, 2002 MT 13, ¶ 16, 308 Mont. 154, ¶ 16, 41 P.3d 314, ¶ 16, Stone argues that this Court should review the sentence imposed although no objection was made at the time of sentencing.

¶45 The State "agrees and concedes" that Stone's sentence of five years on each count of animal cruelty to run concurrently is illegal, as the statutory maximum sentence for animal cruelty is two years on each count. Further, the State agrees that this Court's narrow exception regarding its review of sentences that exceed the statutory mandates, as articulated in *Brister* and established in *State v. Lenihan* (1979), 184 Mont. 338, 602 P.2d 997, applies to Stone's situation here. We agree.

¶46 Section 45-8-211(2)(a), MCA (2001), states:

A person convicted of a second or subsequent offense of cruelty to animals shall be fined not to exceed $1,000 or be imprisoned in the state prison *for a term not to exceed 2 years*, or both. [Emphasis added.]

¶47 Here, Stone was convicted of one misdemeanor count of animal cruelty and of four felony counts of animal cruelty. Stone was sentenced to the Department of Corrections "for a term of five (5) years, for each count, to run concurrent."

¶48 We hold that, in sentencing Stone, the District Court exceeded the statutory parameters of § 45-8-211(2)(a), MCA (2001), when sentencing him to five years on each count of animal cruelty, as evidenced by the above-quoted statutory language. Therefore,

15

we reverse the District Court's sentence and remand this case to the District Court for resentencing in accordance with § 45-8-211(2)(a), MCA (2001).

## CONCLUSION

¶49   In conclusion, we affirm the District Court's denial of Stone's motion to suppress based on the exigent circumstances regarding the present threat to the animals' lives on Stone's property and on the basis of the probation search of Stone's house.  We reverse the District Court's sentencing of Stone to five years on each count of animal cruelty to run concurrently, as the sentencing exceeds the statutory mandates of § 45-8-211(2)(a), MCA (2001).  We remand this case to the District Court for resentencing in accordance with this Opinion.

¶50   Affirmed in part; Reversed in part; and Remanded in part for proceedings consistent with this Opinion.

/S/ JAMES C. NELSON


We Concur:

/S/ KARLA M. GRAY
/S/ JIM REGNIER
/S/ PATRICIA O. COTTER
/S/ JOHN WARNER

16