Carlton DAVIS, Jr., Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 45A03–0808–CR–407.

Court of Appeals of Indiana.

June 11, 2009.

---

Kristin A. Mulholland, Appellate Public Defender, Crown Point, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Joby D. Jerrells, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAILEY, Judge.

### Case Summary

Appellant–Defendant Carlton Davis, Jr. appeals his convictions for Promoting or Staging an Animal Fighting Contest, a Class D felony,[1] Purchasing or Possessing an Animal for an Animal Fighting Contest, a Class A misdemeanor,[2] and Possession of Animal Fighting Paraphernalia, a Class B misdemeanor.[3] We affirm.

### Issues

Davis raises two issues on appeal:

1. Whether the trial court erred in admitting evidence that was obtained in violation of his Fourth Amendment right against illegal searches and seizures; and

2. Whether the trial court erred by admitting evidence in violation of Indiana Evidence Rule 404(b).

### Facts and Procedural History[4]

On Memorial Day weekend in 2006, Glenda Majeski and her husband, neighbors of Davis, had not seen anyone at Davis's house that weekend but had observed dogs on Davis's property barking and carrying their empty food pans. The temperatures had reached between eighty and ninety degrees during the weekend. They also noted a terrible stench that seemed to be coming from the same property. On Memorial Day, the Majeskis finally decided that one of them would go onto the property and provide water for the dogs. When the husband returned, he suggested that his wife call 9–1–1 due to the condition of the dogs. After Glenda called 9–1–1, she went onto the property

---

1. Ind.Code § 35–46–3–9.

2. Ind.Code § 35–46–3–9.

3. Ind.Code § 35–46–3–8.5.

4. We heard oral argument in this case on May 12, 2009, in Indianapolis. We commend counsel for their excellent written and oral advocacy.

and observed thirteen dogs that had many scars, appeared emaciated, and were chained to blue barrels, forcing them to live in their own filth. The dogs were also without food or water. The Majeskis then took dog food and water from their home and provided it to the dogs on Davis's property.

Deputy Vernon Joiner from the Lake County Sheriff's Department responded to the 9–1–1 call. Upon arriving at Davis's home, Deputy Joiner spoke with Mr. Majeski and then proceeded onto the property. Deputy Denise Szany also responded and accompanied Deputy Joiner in walking on the property. First, Deputy Joiner noticed a foul odor that could be detected on the street. As he entered the property, he found a dog, near a red shed, which appeared to be malnourished. The door to the red shed was open, and Deputy Joiner observed a treadmill and a dog collar, bolted to the floor. He did not know the significance of the items in the red shed. The source of the foul smell was later determined to be the carcass of an animal that was in a plastic bag in the bed of a pickup on the property. When Deputy Joiner found the bag, there was a split in the bag through which he observed a rib cage.

From the area near the truck, Deputy Joiner could hear whimpering and crying of dogs. He followed the sounds to find six dogs, which appeared to be malnourished, chained to posts. There was enough distance between the posts to keep the dogs out of each other's reach. Deputy Joiner found another group of dogs on the property in similar condition. He noted that two of the dogs had markings or injuries on their faces. After observing the condition of the dogs, Deputy Joiner contacted his supervisor, who contacted Detective Michelle Weaver. Deputy Joiner also attempted to contact Davis, the owner of the property, but was unsuccessful. Deputy Joiner's shift ended at 2:00 p.m. that day, and he left the property in the care of officers on the next shift.

After speaking with Deputy Joiner and his supervisor between noon and one o'clock that day regarding the circumstances at Davis's home, Detective Weaver, the Lake County Sheriff's investigator for animal cruelty cases, went to the scene to assess the situation. Upon arriving, Detective Weaver spoke with Deputy Szany, who had been waiting in her patrol car. Then Detective Weaver interviewed some of the neighbors. After concluding the interviews, Detective Weaver then walked on the property to observe the condition of the dogs and the items in the red shed. She noted a treadmill, breeding stand, and a device with alligator clips in the red shed. Detective Weaver did not go into or look into the house, metal garage or white pole barn on the property. After viewing the dogs on the property, she concluded that most of the dogs were emaciated and some of the dogs had fresh injuries. Based on her observations, Detective Weaver drafted a search warrant for approval supported by a probable cause affidavit. The search warrant included all of the buildings located on the property to be searched for:

1. Any equipment or items possibly used in the breeding, training, transporting, feeding, caring for, euthanizing or fighting of dogs or roosters

2. Any animals, dead or alive, located on the property

3. Any items documenting the use of animals in fighting contests that have taken place on the property or elsewhere

4. Any photographs or video tapes of the premises

Appendix at 95. The warrant was approved and then executed by Detective Weaver.

On June 12, 2006, the State charged Davis with eight counts of Promoting Animal Fighting Contests,[5] a Class D felony, fifteen counts of Cruelty to an Animal,[6] a Class B misdemeanor, Using an Animal in a Fighting Contest,[7] a Class D felony, Purchasing or Possessing an Animal for an Animal Fighting Contest,[8] a Class A misdemeanor, and Possession of Animal Fighting Paraphernalia,[9] as a Class B misdemeanor. After a jury trial, Davis was acquitted of Using an Animal in a Fighting Contest, and three counts of Cruelty to an Animal, but was found guilty of the remaining charges. The trial court sentenced Davis to an aggregate of six years imprisonment, suspending two years to probation, and ordering two years served at the Department of Correction and the remaining two years in community corrections.

Davis now appeals.

### Discussion and Decision

#### Standard of Review

Davis raises two issues regarding the admission of evidence. Admission of evidence is within the sound discretion of the trial court. *Amos v. State*, 896 N.E.2d 1163, 1167 (Ind.Ct.App.2008), *trans. denied*. We will only reverse a decision of the trial court to admit evidence if there is an abuse of such discretion. *Id.* An abuse of discretion occurs if the trial court's decision is against the logic and effect of the facts and circumstances before the court. *Id.* at 1168.

### I. Admission of Evidence From Search

Davis contends that the trial court abused its discretion in admitting evidence seized as a result of the execution of the search warrant, arguing that: Detective Weaver had no reason to be on his property when she viewed it to obtain evidence to seek the search warrant; there were discrepancies between the testimony of neighbors and their statements listed in the affidavit for the search warrant; and the language of the search warrant was vague and overbroad. Specifically, Davis argues that these deficiencies made the search warrant, permitting the search and seizure of his property, a violation of his right against unreasonable searches and seizures as provided by the federal Constitution.[10] Accordingly, he claims that the trial court was obligated to exclude the allegedly tainted evidence recovered during the search pursuant to the exclusionary rule.

The Fourth Amendment provides, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be

---

5. Ind.Code § 35–46–3–9.5.

6. Ind.Code § 35–46–3–7.

7. Ind.Code § 35–46–3–9.

8. Ind.Code § 35–46–3–8 (2006). The statute was changed in 2007 to denote this crime as a Class D felony.

9. Ind.Code § 35–46–3–8.5.

10. Although Davis asserts that this search also violates his rights under Article I, Section 11 of the Indiana Constitution, he presents no separate argument and analysis with respect to the state constitution. Thus, any separate state constitutional claim is waived because of his failure to make a cogent argument under that provision. *See Francis v. State*, 764 N.E.2d 641, 646–47 (Ind.Ct.App.2002) (notes that Indiana courts interpret and apply Article I, Section 11 independently from federal Fourth Amendment jurisprudence and failure by a defendant to provide separate analysis waives any claim of error).

searched, and the persons or things to be seized." The Fourth Amendment protects citizens against unreasonable searches and seizures of persons and property by requiring a warrant based on probable cause. *Moore v. State*, 827 N.E.2d 631, 637 (Ind. Ct.App.2005), *trans. denied.* "Probable cause exists when an officer has knowledge of facts and circumstances that would lead a reasonably prudent person to believe that a crime has been committed." *Id.* The decision to issue the warrant should be based on the facts contained in the affidavit and the rational and reasonable inferences drawn therefrom. *Redden v. State*, 850 N.E.2d 451, 461 (Ind.Ct.App. 2006), *trans. denied.*

■■■ When reviewing the validity of a search warrant, we focus on whether a "substantial basis" existed for a warrant authorizing the search or seizure. *Id.* Doubtful cases are resolved in favor of upholding the warrant. *Id.* In making this determination, we focus on whether the reasonable inferences drawn from the totality of the evidence support the determination. *Id.* While our standard of review in this situation is de novo, we conduct our review with significant deference to the warrant judge's determination. *Id.*

*A. Warrantless Re-entry of Curtilage*

■ One argument that Davis raises as to the invalidity of the search warrant is that the affidavit submitted to obtain it was based on information that Detective Weaver obtained from illegally viewing his property. He also makes a passing argument that the officers who did the welfare check went beyond the area open to the public. The State counters that the initial warrantless searches were valid because there were exigent circumstances due to the welfare of the dogs on the property.

■■■ "It is axiomatic that warrants, both search and arrest, are required unless probable cause exists along with exigent circumstances rendering it impractical to seek a warrant." *Jones v. State*, 409 N.E.2d 1254, 1257 (Ind.Ct.App.1980). Exigent circumstances may include danger to law enforcement officers or the risk of loss or destruction of evidence. *See Zimmerman v. State*, 469 N.E.2d 11, 16 (Ind. Ct.App.1984). While Indiana courts have not ruled on whether animal cruelty rises to the level of exigent circumstances, other state courts have so held. *See Morgan v. Georgia*, 289 Ga.App. 209, 656 S.E.2d 857, 860 (2008) ("the prevention of needless suffering and death of the animals on [Morgan's] property created exigent circumstances justifying the warrantless search for and rescue of the animals."); *Montana v. Stone*, 321 Mont. 489, 92 P.3d 1178, 1184 (2004) (holding that imminent threat to lives and well-being of animals on property created exigent circumstances justifying the warrantless search of property and rescue of animals); *Tuck v. U.S.*, 477 A.2d 1115, 1120 (D.C.1984) (concluding that the exigent circumstances of the inability of obtaining a warrant without imperiling the life of particular animals justified the warrantless seizure of animals suffering from the conditions at pet shop); *Illinois v. Thornton*, 286 Ill.App.3d 624, 222 Ill.Dec. 60, 676 N.E.2d 1024, 1028–29 (1997); *Pine v. Texas*, 889 S.W.2d 625, 631–32 (Tex.Ct.App.1994); and *Wisconsin v. Bauer*, 127 Wis.2d 401, 379 N.W.2d 895, 898–99 (Ct.App.1985).

The only Indiana case addressing the legality of a search and animal welfare is *Trimble v. State*, 842 N.E.2d 798 (Ind. 2006). In that case, an acquaintance of Trimble reported to police that he had seen Trimble's dog, Butchie, that day and that the dog looked starved and in need of attention. *Id.* at 801. The responding officer pulled into Trimble's driveway, which wrapped around the back of the house. After receiving no answer at the back door, the officer stopped at the dog-

house that was three to five feet from the driveway and thirty feet from the house to check on the condition of the dog. The officer had to coax the dog from the doghouse, revealing that the dog was emaciated and had an injured leg. An animal control officer was contacted to remove Butchie from the property. *Id.* In analyzing the Fourth Amendment challenge to the officer's entry of the curtilage of Trimble's property, our Supreme Court held that "police entry onto private property and their observations do not violate the Fourth Amendment when the police have a legitimate investigatory purpose for being on the property and limit their entry to places visitors would be expected to go, such as walkways, driveways, and porches." *Id.* at 802. It noted that the Fourth Amendment does not protect activities or items, even within curtilage, that are knowingly exposed to the public. *Id.* Thus, since Butchie's doghouse was in open view of the public, it was not afforded the protection of the Fourth Amendment. *Id.* The Court concluded that once the officer examined Butchie he had probable cause based on the apparent animal abuse and exigent circumstances of the dog's health to seize Butchie. *Id.* at 803.

Although the facts at hand are not on all fours with those in *Trimble*, we believe that it is a reasonable extension of the logic in *Trimble* that circumstances of animal cruelty may create exigent circumstances to permit a warrantless search of the curtilage. Similar to those states that have determined the threat to animal life to be a basis for exigent circumstances,[11] Indiana's animal cruelty statute evidences a strong public policy against the mistreatment of animals:

A person who owns a vertebrate animal and who recklessly, knowingly, or intentionally abandons or neglects [endanger an animal's health by failing to provide the animal with food or drink, if the animal is dependent upon the person for the provision of food or drink] the animal commits cruelty to an animal, a Class B misdemeanor.

Ind.Code § 35–46–3–7 (including relevant portion of neglect definition from section 0.5). As conceded by Davis at oral argument, the pervasive smell of rotting flesh and the Majeskis's statement of seeing emaciated dogs on the property created probable cause along with the exigent circumstances of the threat to animal life to permit a warrantless search of the curtilage. Thus, the exigent circumstances were a valid exception to the Fourth Amendment warrant requirement, making Deputy Joiner's inspection of the property valid. Once on the property, Deputy Joiner heard the whimpering of dogs from beyond the wood line on the property. This further supported his search of the curtilage of the property, even into areas beyond that which encompassed areas open to the view of the public, to verify the well-being of the dogs.

 While on the property, Deputy Joiner verified the condition of the dogs and that the Majeskis had provided them with food and water. He then contacted his supervisor to report his findings, called the crime lab to document the evidence of the animal carcass found in a trash bag in the bed of a pick-up truck, and spoke with the police dispatch in an attempt to alert animal control. Both Deputy Joiner and his supervisor subsequently contacted Detec-

---

**11.** In *Montana v. Stone*, the Court noted the language of the animal cruelty or neglect statutes from Washington D.C., Wisconsin, Illinois and Texas evidenced a strong public policy in those states against the mistreatment of animals. 321 Mont. 489, 92 P.3d 1178, 1183 (2004). The statutes criminalized the knowing confinement, beating, or torture of an animal or the failure to provide the necessary food, care or shelter for animals. *Id.*

tive Weaver, the local animal abuse expert, to inform her of the circumstances at the property. Before Detective Weaver arrived on scene, the police shifts had changed, and Deputy Joiner had left the property, leaving no police presence on the Davis property. Once she arrived, Detective Weaver conducted a warrantless search of the property, viewing the same circumstances as Deputy Joiner. Davis asserts that Detective Weaver's search violated his Fourth Amendment rights because the exigent circumstances had abated, eclipsing the validity of police re-entry to the property. Detective Weaver used her observations from her search of the property as well as the information relayed to her by Deputy Joiner and Davis's neighbors to obtain the search warrant.

In *Smock v. State,* this Court held that re-entry of property by police without a warrant to retrieve a body that had been discovered on the initial entry was a violation of the Fourth Amendment's protection against unreasonable searches and seizures. 766 N.E.2d 401, 405 (Ind.Ct.App. 2002). The *Smock* Court held that the initial entry into the apartment was reasonable under the Fourth Amendment because the officers could smell the odor of decaying flesh, had information that the owner of the apartment, Smock, had not been seen in some time, and the police were unable to make contact with anyone in the apartment by knocking on the door. *Id.* These exigent circumstances permitted an exception to the warrant requirement. *Id.* at 406. However, the police then exited the apartment to wait for detectives and the coroner. Upon their arrival, the police re-entered the apartment without a warrant and seized evidence. *Id.* at 405. This holding falls in line with the U.S. Supreme Court's decision in *Mincey v. Arizona* that held that there is no murder scene exception to the Fourth Amendment warrant requirement. *See Mincey v. Arizona,* 437 U.S. 385, 393–394, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).

Our Supreme Court made a similar holding barring warrantless re-entry of a residence by police in *Middleton v. State,* 714 N.E.2d 1099 (Ind.1999). After an officer saw marijuana, rolling papers and scales in plain view while taking a tour of a home as a prospective buyer with a realtor, he attempted to radio for assistance while still in the home, but was unsuccessful. *Id.* at 1100. Upon exiting the home, the officer again radioed for assistance and a few minutes later, re-entered the home through the unlocked back door with the additional officers to seize the evidence. *Id.* The *Middleton* Court held that if an officer is lawfully in a residence and then leaves, re-entry is not justified without a warrant, the consent of the owner, or some other exception to the warrant requirement. *Id.* at 1103. Undergirding this holding is the concept that "[f]or purposes of the Fourth Amendment, however, the threshold of a home is the line that law enforcement officers cannot transgress without judicial authorization." *Id.* at 1101.

Following this precedent, Detective Weaver's re-entry to the curtilage of Davis's property without a warrant, consent from the owner or in circumstances creating an exception to the warrant requirement as originally written violated the Fourth Amendment. Thus, probable cause for approval of the search warrant could not be based on Detective Weaver's observations during her illegal search of the property. However, the probable cause affidavit also included the observations of Deputy Joiner that were relayed to Detective Weaver. "Probable cause may be based on the collective information known to the law enforcement organization as a whole." *Rios v. State,* 762 N.E.2d 153, 163 (Ind.Ct.App.2002) (quoting

*Williams v. State,* 528 N.E.2d 496, 500 (Ind.Ct.App.1988), *trans. denied* ). As the original search of the curtilage was valid, his observations can be used to establish probable cause for the warrant.

The relevant portion of the warrant provided:

> On 05/29/06, Officer Vernon Joiner of the Lake County Sheriff's Department was dispatched to [Davis's property] in a reference to a call of animal cruelty. Officer Joiner spoke with neighbors living to the east [of the property], who advised there were numerous pit bulls located on the property that had not been fed or watered in several days. Officers Joiner and Szany went to the rear of the property to check on the status of the animals there and observed approximately 15 dogs without water, each chained to a 55 gallon drum. The officers observed that several of the dogs were emaciated and appeared to be in distress. Several of the dogs had injuries to their bodies consistent with having been involved in a dog fighting contest. Officers also observed several dead and decaying pit bull carcasses located in the back of a tan Chevy pickup truck in front of the garage. Through an opened door into the reddish-colored garage located on the property, officers also observed equipment commonly used in training fighting dogs, such as a treadmill, a "head-to-head box", weights, chains and leases [sic] used to prepare dogs for fighting.

While the number of carcasses and the observation of weights and chains are not supported by Deputy Joiner's testimony, the vast majority of this section is accurate as to Deputy Joiner's observations. While only one dog carcass was found on the property, one dead dog is enough to raise concern about the activities on a property where numerous infirm dogs are kept. This information combined with information provided to Detective Weaver in her interviews with neighbors of Davis sufficiently establishes probable cause for the search of the premises, including the structures thereon for evidence of dog fighting and animal cruelty. Both neighbors observed instances where a large number of vehicles would converge on the Davis property at one time and men, along with some pit bulls, would go into the white metal garage and emerge a couple of hours later. During one of these gatherings, a neighbor observed a man carrying a dog followed by a man carrying a little black bag. They went from the white pole barn to the red shed and then later returned to the white pole barn.

Therefore, because there was sufficient legally obtained evidence in the affidavit of probable cause to support the issuance of a search warrant, the trial court did not abuse its discretion on this basis in admitting the evidence obtained in the warrant-based search of the Davis property.

### B. Discrepancies Between Affidavit for Warrant and Testimony

 Davis also attacks the validity of the search warrant by claiming that the discrepancies between the information asserted in the probable cause affidavit submitted by Detective Weaver and the testimony of those individuals from whom she obtained the information demonstrate a false statement made knowingly or intentionally or with reckless disregard for the truth. The request for a search warrant is necessarily made *ex parte. Stephenson v. State,* 796 N.E.2d 811, 815 (Ind.Ct.App. 2003), *trans. denied.* Thus, to preserve the basic notions of due process, a defendant can defeat the validity of a search warrant if he can establish by a preponderance of the evidence that "a false statement knowingly and intentionally, or with a reckless disregard for the truth, was included by the affiant in the warrant affi-

davit, ... and the remaining content is insufficient to establish probable cause" for the search. *Id.* (quoting *Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)). If the defendant meets this burden, the search warrant must be voided and the fruits of the search must be excluded to the same extent as if the probable cause was lacking on the face of the affidavit. *Id.* Mistakes and inaccuracies in a search warrant affidavit will not defeat the reliability of the affidavit so long as such mistakes were innocently made. *Lundquist v. State,* 834 N.E.2d 1061, 1072 (Ind.Ct.App.2005).

As discussed above, the portion of the affidavit as to Deputy Joiner's observations did contain some inaccuracies as to the number of carcasses found and the observation of weights and chains in the red shed. A carcass was found on the property, so this inaccurate number is not a statement in reckless disregard for the truth because one dog carcass supports probable cause of criminal activity in the treatment of animals. The mention of the weights and chains is most likely a mix of Detective Weaver's personal observations with those of Deputy Joiner. Even excluding these items, the presence of a treadmill and head-to-head box, used to force breeding, in a shed along with a dog carcass increases support for probable cause looking at the totality of the circumstances. Furthermore, Davis does not contest that these items were actually in the red shed, making Detective Weaver's statements truthful but possibly from her own observations rather than Deputy Joiner's.

The affidavit also provided that the Majeskis "advised that they have observed (and even photographed) what they believe are dog fighting contests ... every 4 to 6 weeks on weekends." Glenda Majeski testified that in February of 2006, she observed numerous cars parked within the fenced area of Davis's property and that they left after two hours. However, within that time a gentleman arrived at the property, left, and returned with a dog, heading to the white garage. Glenda also testified that as everyone was leaving, she observed Davis carrying what appeared to be a dog covered by a blanket.

Finally, the affidavit also provided that another neighbor of Davis, Amanda Hearns, observed activity on May 13, 2006, when "15 cars, each containing 2–3 men and 1–2 pit bulls pulled onto the property[,] ... [they] took the dogs into the white metal garage ... [and] then observed different men ... taking pit bulls, some of them possibly injured, into the reddish-colored garage located on the property." App. at 98–99. The affidavit also indicated that Hearns also observed a man carrying a little black bag, like a doctor's bag, into the red shed. App. 99. At trial, Hearns testified that on May 6, 2006, she observed several cars arrive and at least one man got out with a dog. At some point later, Hearns observed a man carrying a dog from the back of the property and into the red barn. That man was accompanied by another man carrying a little black bag. The only variant between Hearns's statements as relayed in the affidavit and her testimony is the date on which she observed the activity. This inaccuracy is negligible.

Davis also challenges the statement included in the affidavit that Hearns observed several trash bags the morning after the incident "filled with solid objects—probably dead dogs—stacked in and around the large green garbage can[.]" App. at 99. Hearns testified that she did see one large trash bag the next day but denied knowing the contents. Tr. 190. However, this detail is not relevant to the probable cause determination because the statement that the bag probably contained

dead dogs is speculative. Therefore, it would play no role in the determination of whether there was a substantial basis for the search warrant.

While we acknowledge that some of the statements in the affidavit were overstatements, there is still a substantial basis supporting the issuance of the warrant. Furthermore, our standard of review guides us that doubtful cases should still be resolved to uphold the warrant. *Redden*, 850 N.E.2d at 461. Therefore, the warrant was not invalid, and the trial court did not error in admitting the evidence derived from the search based on the warrant.

### C. Language of Warrant

Finally, Davis contends that the search warrant was invalid because it contained vague and overbroad language as to the items sought and the places to be searched. "The Warrant Clause of the Fourth Amendment categorically prohibits the issuance of any warrant except one 'particularly describing the place to be searched and the persons or things to be seized.'" *Maryland v. Garrison*, 480 U.S. 79, 84, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987) (quoting U.S. CONST. AMEND. IV). This prevents general or wide-ranging exploratory searches. *Sowers v. State*, 724 N.E.2d 588, 589 (Ind.2000).

The search warrant provided permission to search the property, including the residence, red shed, white pole barn and white garage for documentary evidence of:

1. Any equipment or items possibly used in the breeding, training, transporting, feeding, caring for, euthanizing or fighting of dogs or roosters

2. Any animals, dead or alive, located on the property

3. Any items documenting the use of animals in fighting contests that have taken place on the property or elsewhere

4. Any photographs or video tapes of the premises

App. at 95. Both parties present cases for comparison to these facts as tools in determining whether the warrant language runs afoul of the Fourth Amendment's particularity requirement.

Davis offers *Hester v. State* and *Warren v. State* as comparable cases. In *Hester v. State*, this Court held that the following language used in the search warrant failed to meet the particularity requirement: "Any and all property which may have been the subject of Theft or Burglary occurring in Union Township, Johnson County, Indiana from the residences of . . ." 551 N.E.2d 1187, 1190 (Ind.Ct.App.1990). This language was imprecise because it failed to precisely detail what items were taken from the residences listed. *Id.* This provided the police with unbridled discretion in executing the search warrant. *Id.*

In *Warren v. State*, our Supreme Court held that the ending phrase to the description of items to be seized was a catchall phrase that granted unbridled discretion to conduct a general exploratory search. 760 N.E.2d 608, 610 (Ind.2002). The phrase was "any other indicia of criminal activity including but not limited to books, records, documents, or any other such items." *Id.* The Court noted that "[t]he infirmity of this catchall language does not doom the entire warrant, however, but rather only requires suppression of the evidence seized pursuant to that [invalid] part of the warrant[.]" *Id.*

Contending that the warrant language sufficiently describes the items to be seized, the State heavily relies on *United States v. Shoffner*, 826 F.2d 619 (7th Cir.1987). The *Shoffner* Court held that the following search warrant language complied with the particularity requirement of the Fourth Amendment:

Stolen motor vehicles, parts of stolen motor vehicles, materials used to retag, dismantle and rebuild stolen motor vehicles and documentation concerning the purchase, sale, ownership, titling and licensing of stolen motor vehicles.

*Id.* at 630. While the Fourth Amendment is in part aimed at prohibiting the evil of a general warrant, it does not require warrants to "enable authorities 'to minutely identify every item for which they are searching.'" *Id.* (quoting *United States v. Pritchard*, 745 F.2d 1112, 1122 (7th Cir. 1984)). A description is sufficient if "it is as specific as the circumstances and the nature of the activity under the investigation permit." *Id.* (quoting *United States v. Blum*, 753 F.2d 999, 1001 (11th Cir.1985)). The opinion also included a list of language of other warrants that were upheld to contain sufficient language to satisfy the Fourth Amendment.[12]

In comparing the language of the warrant to search Davis's property to that of the offered cases, the language is more similar to the examples in *Shoffner* as the warrant is limited to the nature of the activity under investigation, dog fighting. Therefore, the language in the search warrant was adequate enough to satisfy the particularity requirement of the Fourth Amendment and was not vague and overbroad.

## II. 404(b) Evidence

Finally, Davis contends that the trial court erred in admitting evidence that tends to indicate that Davis had previously been involved in dog fighting, thus violating Indiana Evidence Rule 404(b). That rule generally provides: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Such evidence is admissible if it is presented to prove "motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid. Rule 404(b). The purpose of this rule is to prevent a jury from making the "forbidden inference" that the defendant has a criminal propensity and therefore committed the charged conduct. *Roberts v. State*, 894 N.E.2d 1018, 1026 (Ind.Ct.App.2008), *trans. denied.*

Prior to trial, the State filed a notice of its intent to introduce evidence that would indicate Davis's involvement in dog fighting prior to May 2006. The notice indicated that "the State has reason to believe that the defense will introduce evidence at trial indicating that the defendant did not fight dogs, but rather was breeding dogs and entering them in 'weight pulling contests' and 'treadmill races.'" App. at 80. The evidence admitted at trial that Davis challenges is a handwritten paper titled

---

**12.** "Suffice it to say that we and other courts have approved warrants at least as general as the one attacked here. *See United States v. Bentley*, 825 F.2d 1104, 1109–10 (7th Cir. 1987) ("every business paper"); *United States v. Peters*, 791 F.2d 1270, 1278–79 (7th Cir. 1986) ("gems, narcotics and currency"); *United States v. Vanichromanee*, 742 F.2d 340, 347 (7th Cir.1984) ("documents, papers, receipts and other writings which are evidence of a conspiracy to violate" 21 U.S.C. § 963); *Reed*, 726 F.2d at 342 (proof of residency); *United States v. Malik*, 680 F.2d 1162, 1165 (7th Cir.1982) ("books, papers, [and] documents" and baseballs and other items shipped from Pakistan as part of a heroin importation conspiracy); *see also United States v. Strand*, 761 F.2d 449, 452–53 (8th Cir.1985) ("stolen mail which is evidence of and the fruits of the crime of theft from the mail"); *Blum*, 753 F.2d at 1001 ("Porcelain ware, toys, furniture, baby products and miscellaneous merchandise fraudulently obtained from vendors throughout the United States."); *United States v. Gomez–Soto*, 723 F.2d 649, 652–53 (9th Cir.1984) ("representative original samples of handwriting," documents indicative of defendant's residence or citizenship, records of international travel, documents relating to any business transactions of defendant or his three corporations for the previous five years)."

"April Show 2004," a receipt for trophies dated October 24, 2003, print outs dated 2002 from the internet of information on dog fighting, including rules of Cajun dog fighting, a printout of a blog dated 2003 discussing how other dog fighting operations had been "busted" by police, and testimony regarding the observations of neighbors of a gathering at Davis's home in February 2006.

[20, 21] "To decide whether character evidence is admissible under Rule 404(b), the trial court must: (1) determine whether the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the person's propensity to engage in a wrongful act; and (2) balance the probative value of the evidence against its prejudicial effect pursuant to Indiana Evidence Rule 403." *Bassett v. State*, 795 N.E.2d 1050, 1053 (Ind.2003). "In addition, otherwise inadmissible evidence may become admissible where the defendant 'opens the door' to questioning on that evidence. However, the evidence relied upon to 'open the door' must leave the trier of fact with a false or misleading impression of the facts related." *Crafton v. State*, 821 N.E.2d 907, 910–11 (Ind.Ct.App.2005) (citations and quotations omitted).

The State argues that the possession of the internet print outs, trophy receipt, and "April Show 2004" paper are not prior bad acts, and therefore do not fall into the purview of Rule 404(b). As to the printouts from the internet, we agree these items do not fall under Rule 404(b). This is because the date they were printed out is irrelevant. Davis still had this information in his possession the day of the search. Thus, he could continue to utilize this information to promote dog fighting as long as he had the information in his possession no matter how old the piece of paper.

The trophy receipt and "April Show 2004" paper are different because

they indicate past actions taken from which inferences could be drawn of Davis organizing dog fights. Therefore, Rule 404(b) is applicable and the evidence should have been excluded because its prejudicial effect is stronger than its probative value as to Davis's actions in keeping pit bulls in 2006. However, the admission of such evidence is harmless if there is substantial independent evidence of guilt. *Edwards v. State*, 862 N.E.2d 1254, 1261 (Ind.Ct.App.2007), *trans. denied.* Here, evidence included photos of fifteen dogs with numerous scars, a dog carcass, blood-stained carpet from the windowless white pole barn where neighbors had seen gatherings of men and other pit bulls, information on the rules of dog fighting, and information on how other dog fighting rings were discovered by police. Due to this overwhelming evidence, the admission of these two items of evidence is harmless error.

### Conclusion

In sum, despite Detective Weaver's illegal search of Davis's property in violation of the Fourth Amendment there was enough valid untainted information in the probable cause affidavit to support the issuance of the search warrant. Also, the language of the search warrant met the particularity requirement of the Fourth Amendment. Finally, the trial court did abuse its discretion in admitting two pieces of evidence in violation of Indiana Evidence Rule 404(b). However, this was harmless error in light of the overwhelming evidence supporting Davis's dog fighting convictions.

Affirmed.

MATHIAS, J., and BARNES, J., concur.