

**FILED**

Mar 11 2015, 6:12 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Marielena Duerring
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Ignacio Perez,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

March 11, 2015

Court of Appeals Case No.
20A03-1407-CR-236

Appeal from the Elkhart Superior
Court

The Honorable George W.
Biddlecome, Judge

Cause No. 20D03-0909-FA-40

**Najam, Judge.**

## Statement of the Case

[1] Ignacio Perez appeals his convictions, following a bench trial, for dealing in cocaine, as a Class A felony, and resisting law enforcement, as a Class A misdemeanor. Perez presents two issues for our review, both of which we addressed in detail in a prior interlocutory appeal brought by Perez. *See Perez v.*

*State*, 981 N.E.2d 1242 (Ind. Ct. App. 2013), *trans. denied*. Thus, were it not for an opinion issued by the United States Supreme Court subsequent to that appeal, *see Florida v. Jardines*, 133 S. Ct. 1409 (2012), we would apply the law of the case doctrine and affirm in all respects. However, *Jardines* requires us to revisit Perez's second claim of error, which we restate as two issues:

> 1. Whether a police canine sniff conducted at the front door of Perez's home was an unconstitutional search under the Fourth Amendment to the United States Constitution.
>
> 2. Whether the trial court abused its discretion when it admitted certain evidence discovered pursuant to a search warrant for the interior of Perez's home when the search warrant was based on a probable cause affidavit that, among other things, contained information discovered during the canine sniff.

We first hold that the law of the case doctrine precludes our review of Perez's first claim of error, namely, that the police unconstitutionally seized his person. However, in light of *Jardines*, we also hold that the canine sniff of Perez's front door violated the Fourth Amendment. Nevertheless, the probable cause affidavit contained sufficient facts, independent of those discovered by the unconstitutional canine sniff, to provide probable cause for the warrant to search Perez's home. Thus, we hold that the trial court did not abuse its discretion when it admitted evidence discovered during the execution of the warrant, and we affirm Perez's convictions.

## Facts and Procedural History

We recited some of the relevant facts in Perez's prior appeal:

On August 18, 2009, an undercover officer with the Elkhart Police Department's Interdiction and Covert Enforcement (ICE) unit purchased 453 grams of marijuana and 29 grams of cocaine from an individual named Concepcion Avalos-Cortez. The officer and Cortez completed this transaction at a carwash in Elkhart. After the officer purchased the marijuana, Cortez stated that another individual would deliver the cocaine to the carwash.

At some point, an older-model blue Dodge Caravan arrived, and Cortez entered the van. He emerged and handed the officer 29 grams of cocaine. It was subsequently discovered that the van was registered to Jaime Galvez in South Bend. However, after several trips to Galvez's residence and hours of surveillance, the officers were not able to determine that the vehicle was registered to that particular resident.

Two days later, the undercover officer arranged to purchase more cocaine from Cortez. When the officer first arrived at the car wash where the original transaction had occurred, Cortez informed the officer that his cocaine supplier was running late but would deliver the drugs shortly.

Thereafter, when the police officer observed a maroon Ford F-150 truck parked behind Cortez, it was determined that this truck was also registered to Jaime Galvez at the same address. The officer again purchased 29 grams of cocaine from Cortez. The officer had reason to believe Cortez received the drugs from the person in the truck. During hours of surveillance at the registered address, police never saw the truck arrive at or leave the residence.

On August 31, the undercover officer again arranged to purchase 15 grams of cocaine from Cortez. The same maroon truck was at the car wash during this transaction, and the officer again believed that the cocaine had been provided by the person in the

truck. Officers from ICE followed the truck directly from the car wash to Perez's residence.

The following day, the police began surveillance of Perez's residence. The blue Dodge minivan that was used in the controlled buy on August 18 was seen at Perez's residence, and a records search revealed that Perez owned the residence. The police obtained a photograph of Perez from the Bureau of Motor Vehicles (BMV) and discovered that Perez had a handgun permit. The officers believed that the individual delivering cocaine to Concepcion at the car wash might be obtaining the cocaine from Perez's house.

The next day, the undercover officer again purchased 15 grams of cocaine from Cortez at the car wash. The officer then asked Cortez if he could obtain an additional one-and-one-half ounces of cocaine. Cortez told the officer that he could obtain the cocaine within an hour. Cortez remained at the car wash. At some point, a white Ford truck registered to Perez arrived, and the driver met with Cortez for about five minutes. After Perez's truck left, Cortez contacted the undercover officer and informed him that he had the cocaine and arranged to meet. The police officers then followed Cortez, stopped his vehicle, and seized one-and-one-half ounces of cocaine from [Cortez's vehicle].

After arresting Cortez, the police officers went to Perez's residence. Captain Turner from ICE asked Indiana State Police Trooper Mick Dockery and his canine that had assisted in the traffic stop and the arrest of Cortez[] to accompany the officers to Perez's residence and remain nearby in case a uniformed officer was needed.

Captain Turner and another officer arrived at Perez's home and knocked on the front door. The officers saw two surveillance cameras at the front of Perez's house pointed at the front door

and driveway. From their training and experience, the officers recognized that these types of surveillance systems are commonly used by drug traffickers at their drug locations.

Perez answered the door, asked the officers to wait while he disarmed his residential alarm system, and stepped out onto the porch to speak with the officers. The police officers clearly identified themselves to Perez as law enforcement officers, and Perez locked the door behind him as he stepped onto the porch.

Even though the officers recognized him from his BMV photograph, the officers asked Perez his name. Perez responded, "[W]hy"? State's Ex. p. 4. The officers then explained to Perez that a white truck registered to him had been used to deliver cocaine earlier that day. However, Perez lied to them and denied owning the truck. He also denied having any drugs in the house. While speaking with the officers, Perez was nervous and agitated, breathing heavily, and pacing back and forth with his arms folded. During the conversation, Perez walked down from his porch, past the officers, and onto an adjacent patio. The officers remained on the porch steps, which were now between Perez and the front door. Captain Turner radioed Trooper Dockery to come to the scene because Perez was "belligerent." State's Ex. 1.

Captain Turner told Perez that he was going to obtain a search warrant for the residence. The other officers saw Perez's wife at the front door and asked her to step outside. When Perez's wife opened the door, Perez started screaming at her in Spanish and moved back toward the officers at the door of his residence. The officers told Perez to stop, and Captain Turner stood with his arms in the air telling Perez to back up. The police officers did not touch Perez, but he approached them and started to "chest bump" the officers. Perez also attempted to break past them and move toward the front door. Tr. p. 79, 88.

Captain Turner told Trooper Dockery to handcuff Perez. Trooper Dockery, who had arrived in a patrol car and was dressed in uniform, stepped in front of Perez, pulled out his handcuffs, and attempted to place them on Perez. However, Perez repeatedly pulled his arm away and moved backwards towards the driveway. Trooper Dockery pressed Perez against a parked SUV and tried to handcuff him again. Perez fought back, grabbed Trooper Dockery's gun, and the two wrestled to the ground in front of the SUV.

Perez was arrested for resisting law enforcement. When Perez was searched, the police discovered over $1000 cash in Perez's pocket, $260 of which had been used by ICE to buy cocaine that day. The canine then conducted a "sniff" of Perez's front door. Tr. p. 80. The front door was closed at the time, and the canine alerted to the presence of illegal narcotics.

Perez's wife informed the officers that several vehicles were parked in the garage, including a white truck. She also told the officers that no one else was in the home. The police then secured a search warrant for Perez's house at 12:10 a.m. on September 3, 2009.

During a search of the residence, the police discovered over eighty grams of a powdery substance that field tested positive for cocaine, a semiautomatic handgun, ammunition, two digital scales, six open boxes of plastic bags, and over $2400 cash in the master bedroom.

On September 9, 2009, the State charged Perez with dealing in cocaine, [as] a class A felony, and resisting law enforcement, [as] a class A misdemeanor. Thereafter, Perez filed a motion to suppress, alleging that "all evidence seized . . . or obtained by law enforcement authorities as a result of said unreasonable detention and subsequent search of [his] person and home should be

suppressed as a result of the violation of [his] Constitutional rights under the 4th Amendment to the United States Constitution and under Article I, Section 11 of the Indiana Constitution, and pursuant to the 'Fruit of the Poisonous Tree' doctrine as announced by the United States Supreme Court." Appellant's App. p. 41.

Following a hearing on November 10, 2011, the trial court denied Perez's motion to suppress. The trial court determined, among other things, that the police had reasonable suspicion to detain Perez to complete their investigation, and that Perez's arrest for resisting law enforcement was lawful. As a result, the trial court determined that any evidence seized as a result of his arrest was admissible at trial.

It was further determined that because the police officers were lawfully on the premises, it was lawful for the dog to sniff the residence. Thus, based on the results of that sniff, it was reasonable for the police officers to obtain a search warrant for Perez's house and search it. Perez now brings this interlocutory appeal, challenging the validity of his detention by police officers and the subsequent search of his residence.

*Perez*, 981 N.E.2d at 1246-48.

[4]  In his interlocutory appeal, Perez argued that:

the evidence must be suppressed because the police illegally detained him and subsequently placed him in handcuffs. Therefore, Perez contends that his arrest for resisting law enforcement was unlawful and the subsequent search of his person violated his right to be free from unreasonable search and seizure. Perez also claims that there was no probable cause to issue the search warrant for his residence and that the evidence seized during the search of his residence was unlawful.

*Id.* at 1248. However, we affirmed the trial court's ruling and held that (1) the officers had reasonable suspicion to detain him and, therefore, that the they did not illegally seize him; (2) Perez forcibly resisted Trooper Dockery's attempt to handcuff him, which justified Perez's arrest; (3) the cash discovered on Perez's person was discovered pursuant to a lawful search incident to that arrest; (4) the canine sniff of Perez's door was lawful; (5) the search warrant for Perez's home was supported by probable cause; and (6) the search and seizure of Perez did not violate the Indiana Constitution. *Id.* at 1248-52.

[5]     Subsequently, Perez filed a supplemental motion to suppress, which the trial court did not rule on until after Perez's trial, held on May 20, 2014. Following the trial, the court convicted Perez as charged, and it denied his supplemental motion to suppress. The court then sentenced Perez to concurrent sentences of thirty-years for dealing in cocaine, with five years suspended, and one year for resisting law enforcement. This appeal ensued.

## Discussion and Decision

[6]     Perez presents substantially the same arguments here that he presented in his prior interlocutory appeal. Perez contends that the officers illegally seized him in his front yard because they lacked reasonable suspicion or probable cause to do so, which, he reasons, makes the search incident to arrest unconstitutional. Further, Perez asserts that the canine sniff of his front door was unconstitutional and that, absent the information obtained from that search, the search warrant for his home was unsupported by probable cause. Thus, he concludes, the trial court abused its discretion when it admitted evidence

obtained from those searches against him. Among these claims, Perez presents only one new issue, which relates solely to the canine sniff, and thus we apply the law of the case doctrine to all but this one issue.

### Law of the Case Doctrine

[7] The law of the case doctrine is a discretionary tool. *Cutter v. State*, 725 N.E.2d 401, 405 (Ind. 2000). The doctrine allows "appellate courts to decline to revisit legal issues already determined on appeal in the same case and on the same facts," and it may be applied "only to those issues actually considered and decided." *Id.* (internal quotation marks omitted). The doctrine exists "to promote finality and judicial economy." *Id.*

[8] In Perez's interlocutory appeal, we considered and decided all of the issues presented here. However, Perez now presents supplemental authority for this court to consider, which bears on his claim regarding the canine sniff. Namely, Perez asserts that our previous decision regarding the canine sniff of his door conflicts with *Jardines*, a case handed down by the United States Supreme Court approximately one month after we decided Perez's interlocutory appeal. Thus, we consider only Perez's arguments related to *Jardines*. Having already decided that Perez was lawfully detained and arrested, and that police

conducted a valid search incident to that arrest, we apply the law of the case doctrine to those issues and do not revisit them.[1]

## *Canine sniff*

[9] Prior to *Jardines*, Indiana law held that one "does not harbor an expectation of privacy on a front porch where salesmen, neighbors, visitors, or religious proselytizers may appear at any time. In other words, as long as an officer is lawfully on the premises, the officer may have a canine sniff the residence without implicating the Fourth Amendment." *Perez*, 981 N.E.2d at 1250 (*citing Hoop v. State*, 909 N.E.2d 463, 468 (Ind. Ct. App. 2009)). *Jardines*, however, concluded the opposite. *See* 133 S. Ct. at 1414-15.

[10] In *Jardines*, police received an unverified tip that Jardines was growing marijuana in his home, and they dispatched a surveillance team to his residence. Police could not see inside Jardines' home, and fifteen minutes of surveillance revealed no activity inside or outside of the residence. Thus, police brought a drug-sniffing dog to the home's front door. "After sniffing the base of the front door," the dog alerted that it had smelled narcotics. *Id.* at 1413. On that basis alone, police applied for and received a warrant to search the interior of Jardines' home. *Id.* A later search revealed marijuana plants, and Florida charged Jardines with drug trafficking. *Id.*

---

[1] Perez also contends that the recent opinion by our supreme court in *Clark v. State*, 994 N.E.2d 252 (Ind. 2013), alters the analysis that we applied in his interlocutory appeal to the detainment question. We disagree.

In response to the charges, Jardines moved to suppress the evidence recovered during the search of his home on the basis that the warrantless canine sniff by the dog was a physical intrusion on his home within the meaning of the Fourth Amendment. *Id.* He argued that the alert by the dog to the presence of narcotics within his home provided the sole basis in support of the subsequently obtained search warrant for his home, and, thus, any evidence seized was fruit of the poisonous tree. *Id.* The Florida state trial court agreed and suppressed the evidence. After several levels of appeal, the Supreme Court granted certiorari to consider "whether using a drug-sniffing dog on a homeowner's porch to investigate the contents of the home is a 'search' within the meaning of the Fourth Amendment," the Supreme Court ultimately held that it was and affirmed. *Id.* at 1413, 1417-18.

In affirming the trial court, the Supreme Court held that the curtilage of the home, the area immediately surrounding one's home and to which the activity of home life extends, "enjoys protections as part of the home itself." *Id.* at 1414-15. It further held that "[t]he front porch is the classic exemplar" of the curtilage of a home, *id.* at 1415, and, in so doing, it stated that the Fourth Amendment "would be of little practical value if the State's agents could stand [o]n a home's porch . . . and trawl for evidence with impunity," *id.* at 1414.

After establishing that the front porch is part of a home's curtilage and that it enjoys Fourth Amendment protections, the Court then held that officers physically intruded onto Jardines' porch without license, in violation of the Fourth Amendment. *Id.* at 1417. It stated:

A license may be implied from the habits of the country, notwithstanding the strict rule of the English common law as to entry upon a close. We have accordingly recognized that the knocker on the front door is treated as an invitation or license to attempt an entry justifying ingress to the home by solicitors, hawkers[,] and peddlers of all kinds. This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave. . . . Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is no more than any private citizen might do.

But introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else. There is no customary invitation to do that. An invitation to engage in canine forensic investigation assuredly does not inhere in the very act of hanging a knocker. To find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, would inspire most of us to—well, call the police. The scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose. Consent at a traffic stop to an officer's checking out an anonymous tip that there is a body in the trunk does not permit the officer to rummage through the trunk for narcotics. Here, the background social norms that invite a visitor to the front door do not invite him there to conduct a search.

*Id.* at 1415-16 (emphases supplied).

[14]     *Jardines* controls here.[2]   Although the officers had a license to approach Perez's porch and front door to conduct a knock-and-talk, they did not have a similar license to conduct a warrantless search there, with a dog or otherwise.  Consent to talk at one's door does not provide consent to search the curtilage of one's home.  *See id.* at 1416.  "The scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose."  *Id.*  Thus, we hold that the warrantless canine sniff of Perez's front door physically intruded onto the curtilage of his home and, therefore, was an unconstitutional search in violation of the Fourth Amendment.

### *Abuse of Discretion and Search Warrant*

[15]     Although the police violated Perez's Fourth Amendment rights by conducting the canine sniff, we nevertheless hold that the probable cause affidavit contained sufficient information, independent of that obtained by the unconstitutional search at the door, to supply probable cause for the warrant to search the interior of Perez's home.  Thus, the trial court did not abuse its discretion when it admitted evidence of the narcotics and paraphernalia found inside of Perez's home pursuant to that warrant.

---

[2] We are not persuaded by the State's attempts to distinguish the facts here from those in *Jardines*.

[16] "The general admission of evidence at trial is a matter we leave to the discretion of the trial court." *Clark v. State*, 994 N.E.2d 252, 259-60 (Ind. 2013). As we explained in *J.K. v. State*, 8 N.E.3d 222, 228 (Ind. Ct. App. 2014):

> A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion. A trial court abuses its discretion when its decision is clearly against the logic and effect of the facts and circumstances or when the trial court has misinterpreted the law. The constitutionality of a search is a question of law, which we review de novo.

> The ordinary remedy for an unconstitutional search is exclusion of the evidence obtained "in a prosecution against the victim of the unlawful search . . . absent evidence of a recognized exception." *Clark*, 994 N.E.2d at 260.

[17] Further:

> The Fourth Amendment to the United States Constitution and article 1, section 11 of the Indiana Constitution both require probable cause for the issuance of a search warrant. Probable cause is a fluid concept incapable of precise definition and is to be decided based on the facts of each case. In deciding whether to issue a search warrant, the issuing magistrate's task is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit, there is a fair probability that evidence of a crime will be found in a particular place. The reviewing court's duty is to determine whether the issuing magistrate had a substantial basis for concluding that probable cause existed. A substantial basis requires the reviewing court, with significant deference to the magistrate's determination, to focus on whether reasonable inferences drawn from the totality of the evidence support the finding of probable cause. A reviewing court for this purpose includes both the trial

court ruling on a suppression motion and an appellate court reviewing that decision. Although we review de novo the trial court's substantial-basis determination, we afford the magistrate's determination significant deference as we focus on whether reasonable inferences drawn from the totality of the evidence support that determination. In determining whether an affidavit provided probable cause for the issuance of a search warrant, doubtful cases are to be resolved in favor of upholding the warrant. Additionally, we will not invalidate a warrant by interpreting probable cause affidavits in a hypertechnical, rather than a common[-]sense, manner.

*Mehring v. State*, 884 N.E.2d 371, 376-77 (Ind. Ct. App. 2008) (quotation marks and citations omitted; emphases supplied), *trans. denied*.

[18] Perez reasons that, absent the discovery from the unconstitutional canine sniff that drugs were in his home, police lacked probable cause to obtain a search warrant for the interior of his home. Thus, he contends that both the search warrant and all of the evidence discovered pursuant to it are inadmissible under the fruit of the poisonous tree doctrine. *See Hanna v. State*, 726 N.E.2d 384, 389 (Ind. Ct. App. 2000) ("The 'fruit of the poisonous tree' doctrine is one facet of the exclusionary rule of evidence which bars the admissibility in a criminal proceeding of evidence obtained in the course of unlawful searches and seizures."). We disagree.

[19] Where a search warrant is based on both legally obtained information and information obtained in contravention to the Fourth Amendment, we will determine the legitimacy of the warrant only in light of the legally obtained information. *See Davis v. State*, 907 N.E.2d 1043, 1051-52 (Ind. Ct. App. 2009).

Here, excising from the probable cause affidavit the information learned from the canine sniff—namely, that Perez had drugs in his home—the issuing magistrate still had sufficient information to "make a practical, common-sense decision [that], given all the circumstances set forth in the affidavit, there is a fair probability that evidence of a crime will be found in a particular place." *Mehring*, 884 N.E.2d at 377-78. In other words, "despite [the] illegal search of [Perez's] [front door] in violation of the Fourth Amendment, there was enough untainted information in the probable cause affidavit to support the issuance of the search warrant." *Davis*, 907 N.E.2d at 1056.

[20] In particular, the evidence before the magistrate demonstrated that three separate vehicles, involved in four different controlled drug buys, were associated with Perez's residence. Two were observed at his home, and one was registered to him. Despite this, when confronted at his home by police about the registration of one of the vehicles to him, Perez lied to police and denied owning the truck. Further, police observed high-tech security equipment, commonly used by drug traffickers, at Perez's home. Perez also acted suspiciously when confront by police: He paced and breathed heavily, and he was visibly nervous and agitated. And, when an officer attempted to detain Perez after he bumped them with his chest, Perez grabbed the officer's sidearm and wrestled with him. Finally, in a lawful search incident to arrest, police recovered $1,000 on Perez's person, $260 of which had been used by police in prior controlled buy. Thus, probable cause supported the search

warrant for Perez's home, and the trial court did not abuse its discretion when it admitted evidence obtained pursuant to its execution at Perez's trial.

[21]     Article 1, Section 11 of the Indiana Constitution does not change our holding. Although the wording of this provision is "virtually identical to the wording of the search and seizure provision in the federal constitution, Indiana's search and seizure clause is independently interpreted and applied." *Perez*, 981 N.E.2d at 1251. We review the totality of the circumstances and evaluate the reasonableness of the police conduct. *Id.*

> Generally, the reasonableness of a search or seizure under the Indiana Constitution turn on the balance of: (1) the degree of concern, suspicion or knowledge that a violation has occurred; (2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities; and (3) the extent of law enforcement needs.

*Id.* The State has the burden to show that "under the totality of the circumstances, the intrusion was reasonable." *Id.*

[22]     The State has met that burden. Assuming the canine sniff also violated the Indiana Constitution, the search of the interior of Perez's home did not.[3] As discussed above, officers had substantial legally obtained information, detailed in the probable cause affidavit, to suspect that a violation of the law had

---

[3] In Perez's interlocutory appeal we held that the detainment of Perez did not violate the Indiana Constitution. We apply the law of the case doctrine and do not review that determination.

occurred. Moreover, they sought and obtained a valid warrant, so the degree of intrusion into Perez's home, while significant, is nevertheless lawful. Finally, the extent of law enforcement needs were substantial, as officers had connected Perez's home, via the vehicles, to four controlled buys of cocaine. Thus, the search of Perez's home did not violate the Indiana Constitution.

Affirmed.

Mathias, J., and Bradford, J., concur.